### TRIAX PACIFIC, INC., Appellant,

v.

### Togo D. WEST, Jr., Secretary of the Army, Appellee.

No. 97–1067.

United States Court of Appeals, Federal Circuit.

Dec. 3, 1997.

Rehearing Denied Jan. 30, 1998.

</div>

■■■■■■

Timothy Miguel Willardson, Nelson, Snuffer & Dahle, P.C., Sandy, UT, argued, for appellant.

Franklin E. White, Jr., Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, director, and Sharon Y. Eubanks, Deputy Director.

Before MAYER, CLEVENGER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

Triax Pacific, Inc., appeals a decision of the Armed Services Board of Contract Appeals denying its request for an equitable adjustment of a contract to renovate military housing. Because the contract contained ambiguities on its face sufficient to place a reasonable contractor on notice, we apply the "patent ambiguity" doctrine and uphold the decision of the Board of Contract Appeals.

I

In 1990, the Army issued a bid solicitation to renovate 21 military housing units at Fort Shafter, Hawaii. The solicitation called for the construction of new lanais (covered, screened patios) attached to the back of each unit, along with minor interior renovations, such as the installation of new dishwashers and new door locks. As described in the bid packet, each lanai was to be constructed on a new concrete slab poured at the back of each housing unit. The lanais were intended to be fully enclosed areas, with low concrete masonry walls and screens extending up to a wood-frame roof. The Army estimated that the entire project would cost approximately $1.9 million.

Triax was the low bidder on the project, with a bid of $1,593,500. Before awarding the contract to Triax, the Army asked for confirmation of its bid because the figure was lower than the Army's estimated project cost and substantially lower than the bid of the second-lowest bidder. Triax subsequently reconfirmed its bid "[i]n accordance with [Triax's] understanding of the plans and specifications." The Army gave Triax notice to proceed on December 17, 1990, and the contract completion date was established as April 20, 1992.

Triax and the Army first met to discuss the contract at a preconstruction meeting on January 22, 1991. During the course of that meeting, Triax and the Army discovered that they had completely different views as to the painting requirements of the contract. The Army believed the contract required all the newly constructed lanai surfaces to be painted, except for the concrete floor slab. Triax maintained that the contract required only small amounts of painting associated with the interior renovations, and that the lanai surfaces did not have to be painted.

The contract plans and specifications address painting at some length. The General Notes of the contract specify that when a new lock is installed, the door and frame must be painted. Several drawings detailing the kitchen renovation work expressly direct that touchup paint is to be applied to specific surfaces to match existing finishes. The most extensive provisions on painting appear in section 9900 of the specifications, entitled "Painting, General." Because the language of that section is central to the dispute between the parties, the relevant portions are reproduced here:

Section 9900

Painting, General

Part 3 —Execution

. . . . .

13. SURFACES TO BE PAINTED: Surfaces listed in the PAINTING SCHEDULE, other than those listed in paragraphs SURFACES NOT REQUIRING

PAINTING and SURFACES FOR WHICH PAINTING IS PROHIBITED, will receive the surface preparation, paints, and number of coats prescribed in the schedule.

14. SURFACES NOT REQUIRING PAINTING: The following listed items will not require painting: Existing surfaces in good condition, unless otherwise noted or required.

15. SURFACES FOR WHICH PAINTING IS PROHIBITED: The following items shall not be painted: Copper, anodized aluminum, plated surfaces, mineral surfaced built-up roofing, stainless steel.

.    .    .    .    .

18. PAINTING SCHEDULE: The PAINTING SCHEDULE prescribes the surfaces to be painted, and the number and types of coats of paint.

The Painting Schedule referenced in the above provisions appears at the end of Part 3 of section 9900, and lists seven surfaces and the painting treatment associated with each. The seven surfaces are:

1. Exterior and interior concrete masonry units

2. Exterior concrete surfaces

3. Exterior and interior wood surfaces not otherwise specified

4. Exterior ferrous surfaces, exposed, unless otherwise specified

5. Exterior and interior galvanized surfaces

6. Exterior aluminum and aluminum-alloy surfaces

7. Wood cabinets and existing interior wood doors

Of the seven listed items, the first three are applicable to components of the new lanais to be constructed by Triax. None of the drawings pertaining to the construction of the lanais contain any instructions on painting.

Triax and the Army were unable to resolve their differences over the scope of the paint-ing provisions. Ultimately, Triax chose to do the painting requested by the Army and seek an equitable adjustment. The contracting officer denied the request, and Triax appealed to the Armed Services Board of Contract Appeals.

Before the Board, Triax argued that the information contained in the Painting Schedule governs how to paint the seven listed surfaces when those surfaces are identified elsewhere in the contract as requiring paint. To bolster its interpretation, Triax pointed to two other provisions to demonstrate that the contract does not envision that the lanai surfaces would be painted. Paragraph 8.4.3 of section 1900 of the specifications required that Triax complete all work in an individual dwelling unit within 14 working days after gaining access to the unit. Paragraph 10.2 of section 9900 of the specifications directed that concrete masonry units must be allowed to dry (or "cure") for at least 30 days before painting. Therefore, Triax reasoned, an interpretation of section 9900 requiring the lanai surfaces to be painted would be unreasonable, because the requirement of a 30-day curing period before painting would render timely performance of the contract impossible.

Triax also claimed that the Army's interpretation would produce results at odds with customary commercial practice. According to Triax, concrete masonry units such as those to be used on the lanais are frequently left unpainted. Triax also noted that the wood specified for the lanai roof beams is a rough, structural grade that is ill-suited for painting but that has a "rustic" attractiveness in its unpainted state. Triax claimed that if the Army wanted the lanai beams to be painted, the only commercially reasonable course of action would have been to specify a better grade of wood requiring less surface preparation before painting. Finally, Triax argued that because paint degrades over time, the Army's insistence that the lanais be painted would eventually result in a less attractive finished product.

The Board of Contract Appeals rejected Triax's arguments and held that section 9900

of the contract constituted a clear direction to Triax to paint all the surfaces listed in the Painting Schedule, including the surfaces of the lanais. The Board found that the absence of specific directions on the drawings to paint the lanais was not a flaw in the contract, because the plans and specifications were intended to be read together in defining the scope of the work. In its opinion, the Board recognized that accepting the Army's proffered interpretation created a conflict between the curing and timely performance sections of the contract, but found that the conflicts "do not alter the clear requirement for painting the new surfaces."

## II

■ As the issue in this case is solely one of contract construction, we review the findings of the Board de novo. *See Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992). We give the Board's interpretation careful consideration, however, in light of its experience and expertise in construing government contracts. *See Triax–Pacific v. Stone,* 958 F.2d 351, 353 (Fed.Cir.1992).

## A

■ Triax contends that the Board's construction of the contract is unreasonable because it results in a conflict between the painting requirements, the curing directive, and the period allotted for performance. The government responds that the directions in the Painting Schedule clearly encompass the lanai surfaces and that any conflict with the curing requirement and performance time is illusory because the Army did not insist on compliance with the contractually mandated curing period. The government's response, however, misses the point. Without regard to whether the Army was ultimately willing to waive the curing directive in the contract, that directive is facially inconsistent with the government's interpretation of the contract's painting requirements and thus undercuts the government's argument that the contract is unambiguous.

While we reject the government's contention that the contract is unambiguous, we also reject Triax's interpretation of the contract as not requiring any of the lanai surfaces to be painted. The Board rejected Triax's interpretation of the contract as inconsistent with case law and "unsupported by any contract language." We agree with the Board that Triax's interpretation conflicts with the plain language of section 9900 of the contract and therefore cannot be adopted.

In arguing that the contract does not require the lanai surfaces to be painted, Triax points to Paragraph 13 of section 9900, which reads "SURFACES TO BE PAINTED: Surfaces listed in the PAINTING SCHEDULE ... will receive the surface preparation, paints, and number of coats prescribed in the schedule." According to Triax, the "will" in that sentence should be interpreted to mean that when surfaces are specified elsewhere in the contract (*e.g.,* in the drawings) as "surfaces to be painted," and those surfaces are among the seven types listed in the Painting Schedule, they "will receive" the treatment shown in the Painting Schedule. Triax also claims that the results of this interpretation demonstrate its reasonableness. The conflict between the painting requirements, curing time, and performance time is resolved, because the lanais can be completed and left to cure without painting. Moreover, the materials that would be left unpainted, such as the structural support timbers and concrete masonry units, are materials that commonly go without paint. Finally, Triax's reading results in all painted surfaces being clearly marked on the drawings as well as in the specifications.

■ Although Triax's interpretation would bestow consistency on the contract, it would require some of the contract terms to be rewritten. When a contract term is unambiguous, we cannot assign it another meaning, no matter how reasonable that other meaning might seem to be. *See R.B. Wright Const. Co. v. United States,* 919 F.2d 1569, 1572–73 (Fed.Cir.1990). Paragraph 13 references the Painting Schedule to describe

which surfaces are to receive paint. Paragraph 18 of the same specification is even clearer. It states: "PAINTING SCHEDULE: The PAINTING SCHEDULE prescribes the surfaces to be painted, and the number and types of coats of paint." There is no dispute that the lanai surfaces are encompassed in the classes of surfaces listed in the Painting Schedule. The language of section 9900 of the contract thus requires that those surfaces be painted.

Our conclusion is supported by a review of cases dealing with similar Painting Schedule provisions. In *R.B. Wright Construction Co. v. United States,* 919 F.2d 1569, 1571–72 (Fed.Cir.1990), this court interpreted language identical to the language in Paragraphs 13 and 18 of section 9900 of the Triax contract. The court found that language to be an "unequivocal" direction as to what surfaces were to be painted, and held that neither industry practice nor the contractor's view of what constituted necessary painting could alter those requirements. In an earlier case, *HRH Construction Corp. v. United States,* 192 Ct.Cl. 912, 428 F.2d 1267, 1270–71 (1970), our predecessor court construed a contract to build a high rise apartment. Like Triax, the contractor argued that the Finish Schedule of the specifications, rather than the Painting Schedule, described the areas to be painted. The court rejected that theory in light of the "explicit directions to paint" in the Painting Schedule. The court then found the inconsistencies between the Finish Schedule and Painting Schedule to be so glaring as to impose on the contractor the duty to clarify the contents of the contract before placing his bid. *Id.* at 1272.

The Armed Services Board of Contract Appeals has also had occasion to interpret Painting Schedule provisions very similar to the one at issue in this case. In *Pulis Builders, Inc.,* 66–2 BCA (CCH) ¶ 6059, at 27,998 (ASBCA 1966), the contractor argued, as Triax does here, that "[s]pecifications . . . tell him how to paint and drawings where to paint." The Board rejected that argument in light of the "broad, inclusive language" of the Painting Schedule, which plainly prescribed

which surfaces were to be painted. *Id.* at 28,000. More recently, the Board interpreted a contract with wording identical to that used in the Triax contract and found that it unambiguously specified the areas to be painted. *See Caddell Const. Co.,* 97–2 BCA (CCH) ¶ 28,985 (ASBCA 1997). In that case, the contractor argued that the exclusive painting requirements for interior structural steel were defined in a part of the specification entitled "Metal Buildings." The Board rejected that argument as "fail[ing] to account for the explicit painting requirements set forth in section 09900 of the specification. . . ." *Id.* at 144,341. Thus, each time a contractor has made an argument such as the one Triax proposes, the court or the Board has rejected it. For the same reasons, we reject the argument again.

## B

We are left with a situation in which neither Triax nor the government can harmonize all provisions of the contract. Under the government's interpretation, either the painting, curing, or timing requirements must be waived. Triax's interpretation avoids those conflicts, but it does so by reinterpreting the Painting Schedule in a manner inconsistent with its clear language. Neither explanation is satisfactory, and our conclusion is that the contract terms cannot be reconciled with one another. The remaining question is whether the problems with the contract are such "patent and glaring discrepanc[ies]" as to warrant application of the "patent ambiguity" doctrine. *See Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963).

Ambiguities in a government contract are normally resolved against the drafter. An exception to that general rule applies, however, if the ambiguity is patent. *See Interstate Gen. Gov't Contractors, Inc.,* 980 F.2d at 1434–35. The existence of a patent ambiguity in a government contract "raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation." *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985). That

duty requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. *See Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982). Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor. *See Beacon Constr. Co.,* 314 F.2d at 504.

■ The patent ambiguity doctrine is a court-made rule that is designed to ensure, to the greatest extent possible, that all parties bidding on a contract share a common understanding of the scope of the project. That objective is particularly important in government contracts, in which significant post-award modifications are limited by the government's obligation to use competitive bidding procedures and by the risk of prejudice to other potential contractors. *See* James F. Nagle, *Federal Construction Contracting* § 22.3, at 305 (1992). In addition, the duty of inquiry prevents contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing their bids and then, after the award, seeking equitable adjustments to perform the additional work the government actually wanted. *See Interwest Constr. v. Brown,* 29 F.3d 611, 616 (Fed.Cir.1994); *S.O.G. of Ark. v. United States,* 212 Ct.Cl. 125, 546 F.2d 367, 371 (1976).

■ While this court has invoked the patent ambiguity doctrine in appropriate cases, it has not given the doctrine broad application. Because the doctrine has the effect of relieving the government from the consequences of its own poorly drafted contracts, the doctrine has been applied only to contract ambiguities that are judged so "patent and glaring" that it is unreasonable for a contractor not to discover and inquire about them. *See Beacon Constr. Co.,* 314 F.2d at 504. More subtle ambiguities are deemed latent and are accorded an interpretation favorable to the contractor under the doctrine of *contra proferentum. See Interstate Gen. Gov't Contractors, Inc.,* 980 F.2d at 1434.

■ In this case, the contradictory provisions in the contract were so apparent that Triax had a duty to ask for clarification before bidding. Although Triax argues that it was not aware of the inconsistency among the contract terms at the time it submitted its bid, the presence or absence of a patent ambiguity is not determined by the contractor's actual knowledge, but rather by what a reasonable contractor would have perceived in studying the bid packet. *See HRH Constr. Corp.,* 428 F.2d at 1272; *J.A. Jones Constr. Co. v. United States,* 184 Ct.Cl. 1, 395 F.2d 783, 790 (1968). To the extent Triax was unaware of the problems with the contract, that lack of recognition can be ascribed to its unreasonable interpretation of the language of the painting specifications. There is also no legal force to Triax's claim that its reading of the contract would have resulted in a superior product. Even if true, a contractor is not absolved of the responsibility to inquire about a patent ambiguity simply because the contractor's interpretation would result in a commercially sensible product. *See Fortec Constructors,* 760 F.2d at 1291.

Substantial portions of the contract address painting requirements. When the Painting Schedule is accorded its natural interpretation as a direction of what surfaces to paint, the conflict between the curing directive and the performance time requirement is immediately apparent. A reasonable contractor studying the specifications prior to submitting a bid would have recognized the ambiguity. The contract is therefore patently ambiguous and, as such, must be construed against Triax. On that ground, we affirm the decision of the Board of Contract Appeals.

*AFFIRMED.*