### NVT TECHNOLOGIES, INC., Plaintiff,

v.

### The UNITED STATES, Defendant.

### No. 02–66C.

United States Court of Federal Claims.

Nov. 1, 2002.

---

John R. Tolle, McLean, VA, for plaintiff. William T. Welch, of counsel.

Wanda Rubianes–Collazo, U.S. Department of Justice, Washington, DC, with whom were Robert D. McCallum, Assistant Attorney General, and Director David M. Cohen, for defendant. Richard Welsh, Naval Facilities Engineering Command, of counsel.

## OPINION

FIRESTONE, Judge.

This case arises as a bid protest over the United States Department of the Navy's ("Navy's" or "Agency's") final cost comparison during the bid evaluation process for solicitation number N68711–01–R–5101. Plaintiff, NVT Technologies, Inc. ("NVT"), the sole private bidder in this solicitation, asserts that the Navy's determination that the Agency's in-house most efficient organization ("MEO") offered a lower price for performance was unreasonable. NVT claims that the government "failed to perform an adequate cost evaluation when they failed to understand that the MEO's costs and NVT's costs were based upon differing interpretations" of the solicitation specifications. The government asserts that NVT's arguments are taken out of context, and that, seen in the context of the entire solicitation, NVT's interpretation was unreasonable and insufficient to prove that the agency's decision was arbitrary or capricious.

Presently pending before the court are plaintiff NVT's and defendant United States's ("government's") cross motions for judgment upon the administrative record. For the reasons that follow, plaintiff's motion for summary judgment on the administrative record, filed March 15, 2002, is hereby **DENIED**, and defendant's cross-motion for

summary judgment on the administrative record, filed April 29, 2002, is hereby **GRANTED.**

## I. BACKGROUND FACTS

The following facts are undisputed unless noted otherwise.

### A. The Solicitation

On November 15, 2000, the Navy issued solicitation number N68711–01–R–5101 (the "solicitation") to obtain private sector proposals for facility maintenance and utility services for the Marine Corps Recruit Depot in San Diego, California. The core services solicited included facilities maintenance and repair, utilities operations and maintenance, facilities planning, engineering, and environmental support services. The solicitation informed offerors that it was issued as part of a government cost comparison to determine whether accomplishing the specified work under contract or by government performance was more economical. If government performance was determined to be more economical, then no award under the Request for Proposals ("RFP") would be made and the solicitation would be cancelled.

The solicitation provided that the private-sector competition would begin with the submission of "statements of qualifications" from interested offerors and that these submissions would be evaluated under two factors: corporate experience and past performance. After evaluating these statements, the agency would tell each offeror whether it was considered "to be a viable competitor." Whatever the agency's advice, all firms sub-

mitting statements of qualification were permitted to continue in the competition.

The solicitation informed offerors that they were "urged and expected to inspect the site where services are to be performed and to satisfy themselves regarding all general and local conditions that may affect the cost of contract performance ..." In particular, offerors were directed to the technical library, the MAXIMO system, and the Depot's history files to complete their bids.[1]

Solicitation Attachment J–C 2(a) is at the heart of this particular litigation. Administrative Record ("AR") 254–97. Attachment J–C 2(a) contains hundreds of line-item workload estimates in a table format with each page containing column-headers including, "Number," "Unit of Measure," and "Frequency." The individual line items in Attachment J–C 2(a) vary with respect to whether data is entered in those three columns. The price proposal required each offeror to estimate the skilled categories and the labor hours required to perform the work listed in Attachment J–C 2(a). After estimating the labor required to perform the work listed, the price proposal then required offerors to price the work according to the format provided at Attachment J–L6 of the solicitation.

More specifically, the issue in this case surrounds thirteen line-items in Attachment J–C 2(a)7, under the heading "MISC CERAMIC TILE REPAIR." AR 278. Those line-items identify the workload data for miscellaneous ceramic tile repairs for the facilities covered in Attachment J–C 5:

Paragraph

1. The *Declaration of James M. Benge,* an employee at the Marine Corps Recruit Depot ("MCRD") who conducted a tour of the MCRD facility for interested bidders, stated that Mr. V. Thanh Nguyen, the president of NVT Technologies, Inc., was the only attendee for the tour. During that tour, Mr. Benge demonstrated how to use the technical library and the MAXIMO Computerized Maintenance Management System software program and "advised Mr. V. Thanh Nguyen that the technical library and MAXIMO system would be made available to NVT Technologies, Inc. for use in preparing NVT Technologies, Inc.'s proposal for the OMB Circular No. A–76 Performance of Commercial Activities cost

Unit of

comparison study for MCRD base operations and maintenance support services." Mr. Benge explained to Mr. Nguyen that the technical library contained information such as equipment inventories, preventive maintenance schedules, technical manuals, Internet links to equipment manufacturers, and regulatory requirements. MAXIMO was described as a system which provides updated information of all equipment inventories, maintenance schedules, warranties, projected equipment replacement data, and long range maintenance plans. To the best of his knowledge, Mr. Benge declared that NVT never requested the use of these resources. AR 2815–16.

| Number | Title | Number | Measure | Frequency |
|---|---|---|---|---|
| C–5.2.3.2 | **MISC CERAMIC TILE REPAIR** | | | |
| C–5.2.3.2 | Form, Place & Finish Concrete | 119 | SF | 12 |
| C–5.2.3.2 | Lay 8″X8″X16″ Concrete Cinder Block | 52 | SF | 6 |
| C–5.2.3.2 | Lay Brick | 7 | SF | 5 |
| C–5.2.3.2 | Miscellaneous Concrete Repairs | 60 | SF | 16 |
| C–5.2.3.2 | Prepare, Place & Finish Plaster | 48 | SF | 19 |
| C–5.2.3.2 | Prepare, Place & Finish Stucco | 48 | SF | 18 |
| C–5.2.3.2 | Replace 1″X1″ Ceramic Wall Tile | 59 | SF | 4 |
| C–5.2.3.2 | Replace 12″X12″ Ceramic Marbleized Floor Tile | 98 | SF | 9 |
| C–5.2.3.2 | Replace 2″X2″ Ceramic Wall Tile | 59 | SF | 8 |
| C–5.2.3.2 | Replace 4″X4″ Ceramic Wall Tile | 387 | SF | 89 |
| C–5.2.3.2 | Replace 6″X6″ Ceramic Quarry Floor Tile | 365 | SF | 97 |
| C–5.2.3.2 | Replace 6″X6″ Ceramic Wall Tile | 52 | SF | 5 |
| C–5.2.3.2 | Cyclic Maint to Repair Ceramic Tile in Messhalls, etc. | 6 | HRS | Daily |

AR 278.

At the heart of this conflict lies each bidder's interpretation of these thirteen line-items. NVT's solicitation bid multiplied the "Number" and the "Frequency" and thus prepared its technical and price proposals on 76,209 square feet of tile and 28,647.85 man-hours for the work. It is not disputed that NVT did not consult the technical library, MAXIMO, or the Depot's history files in arriving at this figure. In contrast, the MEO understood the "Number" term to represent the total square feet in the tile repair section. Its cost estimate, therefore, was based on 1,354 square feet of tile and 1,354 man-hours of work.

### B. The Bidding Process

The Navy received statements of qualifications from three offerors, including NVT. NVT's statement was evaluated by the Agency's quality evaluation board ("QEB") as acceptable for corporate existence and past performance. Only NVT was found to be a viable competitor, and only NVT elected to continue to participate in the remainder of the competition. Prior to the closing date for receipt of NVT's technical and price proposals, the Naval Audit Service, as the independent review official, certified that the MEO study team's management plan satisfied the Performance Work Statement ("PWS") requirements and that the in-house cost estimate was reasonable. The Agency then sealed the management plan and in-house cost estimate.

After NVT's technical and price proposals were submitted, the Agency conducted two rounds of discussions with the company. NVT did not inquire about whether it had properly interpreted the miscellaneous ceramic tile repair portion of its bid. The Agency found NVT's final revised proposal acceptable under both the statement of qualifications factor and the technical and management approach factor. The price evaluation board found NVT's proposed price to be realistic, complete, and reasonable. The Agency selected NVT's proposal as the private-sector offer to compete against the in-house plan.

After selection of NVT's offer, the Navy's quality comparison team ("QCT") evaluated the in-house plan "to ensure that the technical proposals of NVT and the government offered the same level of performance and performance quality." AR 3022. QCT discussed the PWS requirements with the MEO study team and subsequently found that the in-house plan was "balanced in performance and quality to that proposed by [NVT]." *Id.*

The Navy then proceeded to the cost comparison, which concluded that performance by the MEO would cost less than performance by NVT. With respect to the issue on appeal, it is not disputed that no individual pricing was provided for miscellaneous ceramic tile; instead, an overall price was provided. Specifically, the Navy found that NVT's adjusted cost at $43,025,120 was $3,937,980 higher than the MEO's proposed

costs at $39,087,140. The initial award, therefore went to the in-house MEO on July 26, 2001.

On August 27, 2001, NVT appealed the cost comparison decision to the administrative appeal authority ("AAA"). The appeal set forth multiple allegations, including claims that the in-house cost estimate was understated because it did not include training costs, costs for implementing the required safety program, certain material costs, and costs for certain maintenance services. With respect to this appeal, NVT argued before the AAA that the MEO's material estimate was too low, but NVT did not specifically identify how it had interpreted the miscellaneous ceramic tile provision.

On August 30, 2001, the MEO responded to the appeal by adding a separate quality control position and providing a revised in-house cost estimate which reflected an overall increase of $949,489. On September 27, 2001, the AAA issued a final determination accepting the MEO's changes and denying the remainder of NVT's issues, including its allegations that the MEO had made an unreasonably low estimate to perform specified ceramic tile and other repairs throughout the facility over the life of the contract.

### C. The GAO Final Decision

On October 4, 2001, NVT protested the AAA's final decision to the General Accounting Office ("GAO"). NVT again raised issues pertaining to training costs, costs for implementing safety, and certain maintenance services. In addition, NVT argued issues of roof leak repairs, raw labor estimates, and performance of ceramic tile repair. In its protest, NVT identified Miscellaneous Ceramic Tile Repair as one area of work where the MEO had underestimated the labor requirement and, therefore, submitted too low of a price proposal.

On January 3, 2002, GAO issued a decision denying NVT's protest. Specifically, in reference to the ceramic tile issue, the GAO stated, "We need not address these contentions because the cost impact asserted by the protestor would not change the outcome of the cost competition between NVT and the in-house team."

### D. This Litigation

On January 24, 2002, NVT filed a complaint with this court alleging that the United States unlawfully concluded under the A-76 process that it should continue base operations and maintenance services in-house. Specifically, NVT contends that the solicitation plainly calls for the volume of ceramic tile repair specified by NVT and if the proper cost is attributed to the MEO, NVT's bid is lower and, therefore, NVT is entitled to the award. In response, the government contends that NVT's reading of the solicitation is not supported and that the award to the MEO should be affirmed.

Oral argument in this case was held on June 5, 2002. At the argument, the court questioned whether NVT had made a good faith mistake in its bid and whether the AAA had an obligation to ferret out that mistake and to then allow NVT to correct it. The court then ordered supplemental briefing focusing on the issues of bid mistake and whether the government had an obligation to inform NVT of its misreading of the required specifications. The court also instructed NVT to illustrate whether there is evidence that an adjustment in its bid would make a significant enough difference to displace the in-house estimate. This decision follows the completion of that briefing.

## II. DISCUSSION

### A. Standard of Review

Whether the government's A-76 decision can stand turns on questions of law. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the United States Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate,

it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

## B. The Solicitation Was Not Ambiguous

■ Both parties argue that the solicitation plainly supports their view. Thus, as a threshold question, the court must first determine whether the solicitation was ambiguous or plainly supports one reading or another. The court finds that the solicitation was not ambiguous and that the government's reading of the solicitation is correct.

Solicitation Attachment J–C 2(a)7, the portion of the solicitation where the parties have focused the court's attention, is the section of the solicitation that lists the workload data for miscellaneous ceramic tile repairs in thirteen line-items. NVT points out that there are hundreds of line items within Attachment J–C 2(a), and all but twelve of those line-items express a verbal command in the "Frequency" column of the table. These verbal commands include, "Monthly," "Quarterly," "Weekly," etc. The only twelve line-items where "Frequency" is expressed numerically is within the sub-section "MISC CERAMIC TILE REPAIR." NVT therefore argues that the solicitation plainly required the multiplication of "Number" and "Frequency" for each line-item within Attachment J–C 2(a), including the thirteen line-items in the sub-section "MISC CERAMIC TILE REPAIR." The multiplication of these columns resulted in NVT's price proposal for tile repair to be based upon 76,209 square feet of ceramic tile and 28,647.85 man-hours.

The government argues that NVT's reading is flawed for two reasons. First, the government argues that twelve of the thirteen line-items are expressed in unique terms, and therefore NVT erred in applying the same mathematical formula to this sub-section as the rest of Attachment J–C 2(a). Second, because these line-items were unique, NVT should have referred to the language in the rest of the solicitation to interpret the solicitation's tile requirements. According to the government, had NVT investigated the language of the technical library, MAXIMO and the Depot's history files, NVT would have seen "that the 13 line-items in Attachment J–C 2(a)(7) represented annual estimates without any further mathematical computation." Thus, the government argues that the solicitation plainly did not require the multiplication of "Number" and "Frequency" in order to determine total ceramic tile requirements. Instead, the government contends the solicitation plainly called for pricing based on annual estimates.

Moreover, the government argues that it is simply not reasonable that the Navy would annually require 76,209 square feet of ceramic tile, or "approximately 1.3 football fields of tile per year for eight years ... an amount inconsistent on its face with the description 'miscellaneous tile repair' within 'facilities maintenance.' "

Given the plain language of the solicitation, the court finds that the government has the better view. The government would not have ordered such a large portion of tile repair without confirmation elsewhere in the solicitation materials. While the court does not question NVT's good faith belief that this particular sub-section of the solicitation required 76,209 square feet of tile annually, good faith beliefs are not always reasonable beliefs. In order to prevail, NVT had to show that its reading of the solicitation was reasonable. "To show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term; rather, both interpretations must fall within a zone of reasonableness." *Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed. Cir.1999) (citations omitted). NVT's construction of the solicitation is not a reasonable interpretation given the information provided in the rest of the solicitation and the resources available to offerors in the technical library or in the statistics in the MAXIMO computerized system. In such circumstances, the solicitation was not ambiguous and NVT's argument fails.

## C. Even if the Solicitation was Ambiguous, the Ambiguity was Patent

■ Even assuming that NVT's reading of the provision was reasonable, and there

**336**

was an ambiguity, that ambiguity was plain on its face and therefore NVT's reading cannot prevail. An ambiguity will only be construed against the government if it was not obvious on the face of the solicitation. If the ambiguity is obvious, it is patent and triggers a duty to inquire. A patent ambiguity is one that is "obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start." *H & M Moving, Inc. v. United States*, 204 Ct.Cl. 696, 939, 499 F.2d 660, 671 (1974). Finally, if an ambiguity is obvious and the plaintiff fails to inquire with regard to the provision, his interpretation will fail. *See Triax Pacific, Inc. v. West*, 130 F.3d 1469 (Fed.Cir.1997).

■ Here, the court finds that the uniqueness of twelve line-items with numerical "Frequency" in the midst of hundreds of line items giving verbal "Frequency" commands should have sparked NVT to inquire as to the true meaning of the cost calculations for these specific items. It is "obvious, gross [and] glaring" that the twelve line items are different from the hundreds of other line-items in the Attachment J–C 2(a) table. Moreover, the thirteenth line-item within the same sub-section, "MISC CERAMIC TILE REPAIR," gives a verbal "Frequency" of "Daily." Thus, there was inconsistency even within the sub-section. NVT had a duty to inquire whether the calculations for this section were consistent with the rest of the table.

The United States Court of Appeals for the Federal Circuit has settled how such patent ambiguities must be viewed by this court:

> The existence of a patent ambiguity in a government contract "raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation." That duty requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor.

*Triax*, 130 F.3d at 1474–1475 (citations omitted). NVT does not dispute that it did not make any inquiry. Accordingly, NVT's interpretation of the solicitation must be rejected.

## D. Government Did Not Have a Duty to Allow NVT to Correct its Bid

Ordinarily, having concluded that NVT's bid was based on its own error, the court's inquiry would end. However, here, the court asked whether a different rule should apply in A–76 cases if the agency has some notice of the error. The court asked for supplemental briefing on this question.

The government responded by explaining that the FAR does not specifically address how to handle mistakes in an A–76 negotiated procurement. In such circumstances, the government argues that the A–76 process does not give additional rights to the bidder. To the extent any provision applies by analogy, the government argues that the court should look to the FAR sections applicable to mistakes before award in sealed bid situations. When applying these provisions, the government asserts that "the CO's authority and/or duty to request bid verification or consider allowing correction of mistake in bid existed up to the moment in which the CO selected the private sector's most advantageous proposal." The government argues that once the proceedings reached the AAA, the CO's authority was limited to implementing the AAA's decision and there was no basis for allowing NVT to correct. According to the government, the AAA's authority is limited to considering errors in completing the cost comparison form. The government asserts that no such error occurred in this case.

NVT does not directly dispute the government's analysis, rather it contends that the court should not examine this case as a "mistake in bid case," but as a "defective specification" case. In support of its position, NVT relies on *IT Corporation*, 2002 WL 1476286 (Comp.Gen.) (July 10, 2002), for the proposition that when a solicitation is defective, such that bidders cannot know on what they are bidding, the solicitation should be rebid. NVT argues here that it has shown that the solicitation was defective. Because the court has found above that the Navy's solicitation was not ambiguous, it was therefore not "defective" and NVT's argument fails.

■ Where, as here, the solicitation was not ambiguous, and NVT could have more thoroughly researched its bid and inquired as

to whether it had properly interpreted the solicitation but failed to do so, this case does not involve a question of a defective solicitation. Once again, while the court appreciates NVT's contention that the solicitation was not clear to the bidder, the law requires bidders to make inquiries when they are uncertain. *See Triax,* 130 F.3d at 1474–1475. Because NVT should have asked about its understanding of the solicitation, but failed to do so, its contention that the solicitation was defective must be rejected. *See Comtrol, Inc. v. United States,* 294 F.3d 1357, 1363–65 (Fed.Cir.2002). In such circumstances, there is no basis here for the court to order a correction of the solicitation.

## III. CONCLUSION.

For the above-referenced reasons, plaintiff's motion for summary judgment on the administrative record, filed March 15, 2002, is hereby **DENIED**, and defendant's cross-motion for summary judgment on the administrative record, filed April 29, 2002, is hereby **GRANTED**. Parties to bear their own costs.