# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --          )
)
Tri-County Contractors, Inc.     )    ASBCA No. 58167
)
Under Contract No. N69450-10-C-3597  )

APPEARANCES FOR APPELLANT:     Crystal W. Martin, Esq.
    Suzanne G. Keys, Esq.
    Rafael R. Green, Esq.
      Precious Martin, Sr. & Associates, PLLC
      Jackson, MS

APPEARANCES FOR THE GOVERNMENT:  Ronald J. Borro, Esq.
      Navy Chief Trial Attorney
      Pamela J. Nestell, Esq.
      Senior Trial Attorney
      Taylor N. Ferrell, Esq.
      Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE JAMES

On 6 June 2012 Tri-County Contractors, Inc. (Tri-County) appealed from the contracting officer's (CO's) 30 May 2012 letter denying Tri-County's $242,830 claim under the captioned contract. The Board has jurisdiction of the appeal under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109. After a two-day hearing in Gulfport, Mississippi, the parties submitted post-hearing and reply briefs. The Board is to decide entitlement only (tr. 1/9).

## FINDINGS OF FACT

1. In 2010 the U.S. Department of Labor (DOL) proposed to debar Tri-County for Service Contract Act violations, and held a hearing on the matter on 22-23 April 2010 (R4, tab 68 at 1124[1]).

2. On 29 June 2010 the Naval Facilities Engineering Command (NAVFAC), Southeast, Naval Construction Battalion Center (NCBC), Gulfport, Mississippi, solicited the replacement of the oil and lubricating system in NCBC Building 400 on a sole-source, Small Business Administration § 8(a) basis (R4, tab 18 at 745). Heffernan Holland Morgan Architecture (HHMA) was NAVFAC's architect-engineer

---

[1] Rule 4 references are to Bates-stamped page numbers.

for the NCBC Building 400 project. HHMA contracted with Peterson Engineering, Inc., to design the oil/lube system. (R4, tab 3 at 171, tab 23 at 910; tr. 2/52)

3. Tri-County's employee Mr. Lynn Ladner "look[ed] at the specs and drawings [to] make sure [Tri-County] could do that work for" the price to be proposed on the Building 400 solicitation (tr. 1/68-69).

4. Based on price negotiations between CO Cathy M. Gill and Mr. Ladner, on 30 June 2010 Tri-County proposed to perform the solicited oil/lube replacement at NCBC Building 400 for $618,304.00 (R4, tab 18 at 746-47). In its offer Tri-County certified that it had not been proposed for debarment (R4, tab 18 at 757). However, Mr. John Hunter, Tri-County's president, fully disclosed the proposed DOL debarment to CO Gill, stating that the DOL Board of Appeals told Mr. Hunter that he was legally able to continue contracting as long as he wasn't debarred. According to Mr. Hunter, CO Gill told him that "you're not debarred. And so I don't care about the rest. I got to get this contract awarded." (Tr. 1/212-13) CO Gill did not testify.

5. The solicitation provided for an 8 July 2010 site visit (R4, tab 18 at 745, 780). At the site visit Messrs. Hunter and Ladner had the plans and specifications and toured the facility (tr. 1/40, 69).

6. On 20 July 2010 NCBC CO Gill awarded to Tri-County Contract No. N69450-10-C-3597 (the contract) which Mr. Hunter signed on 21 July 2010, for the firm-fixed-price of $618,304.00, with a contract completion date of 2 December 2010 (R4, tab 1 at 1-4, 19).

7. The solicitation and hence the contract (by virtue of Standard Form 1442, Block 29) incorporated by reference the FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) clause which provided in pertinent part:

> (h) *Final Payment.* The Government shall pay the amount due the Contractor under this contract after—
>
> (1) Completion and acceptance of all work;
>
> (2) Presentation of a properly executed voucher; and
>
> (3) Presentation of release of all claims against the Government arising by virtue of this contract, other than claims, in stated amounts, that the Contractor has specifically excepted from the operation of the release.

2

(R4, tab 18 at 770, tab 1 at 2) and the DFARS 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) clause (R4, tab 1 at 19). The contract did *not* incorporate the FAR 52.243-4, CHANGES (JUN 2007) clause required by FAR 43.205(d)(2) for construction contracts exceeding the $100,000 simplified acquisition threshold.

8. Specification § 33 52 11, "OIL/LUBRICATION SYSTEMS," stated in ¶ 2.2, "PIPE": "Pipe shall meet the material, fabrication and operating requirements of ASME B31.3"; in ¶ 2.2.1: "Provide steel pipe that complies with the requirements indicated on the drawings"; in ¶ 2.16.6, "Pipe Sleeves": "Provided [sic] sleeves constructed of hot-dipped galvanized steel, ductile iron, or cast-iron pipe"; and in ¶ 3.1.6, "Pipe Sleeves":

> Provide a pipe sleeve around any pipe that…crosses under a roadway.… Sleeves shall be of such size as to provide a minimum of ½ inch all-around clearance between bare pipe and the sleeve. Align sleeve and piping such that the pipe is accurately centered within the sleeve.… Securely anchor the sleeves to prevent dislocation.

(R4, tab 2 at 161, 164, 166, 168-69)

9. Drawing P101 is a plan view of Building 400, on whose exterior 6 overhead pipes ran horizontally for about 25 feet, at which point the pipes turned vertically to a concrete roadway, turned southeast for about 80 feet and turned northeast for about 30 feet to the tank canopy (or tank farm). Drawing Note 5 stated: "PIPING RUN UNDERGROUND TO THIS LOCATION. SEE P-201 FOR PICTURE OF LOCATION." (R4, tab 3 at 172, notes 5, 6, at 178, notes 7, 8)

10. Drawing P105 had demolition and new work plans. The demolition plan depicted an "AREA OF CONCRETE ROAD TO BE REMOVED" in which were six parallel pipes with Note 1 stating: "REMOVE EXISTING UNDERGROUND PIPING COMPLETE. See P-201." The new work plan depicted eight pipes in the same area with Note 2 stating: "NEW DOUBLE WALL PIPING SLOPED TO INSPECTION PORT FOR EACH PRODUCT LINE." (R4, tab 3 at 176)

11. Drawing P106, zone B-3, is a cross-section of a "TRENCH DETAIL" in which a "CARRIER PIPE" was depicted as a small circle inside a larger circle at the trench bottom under "EXISTING CONCRETE PAVING" (R4, tab 3 at 177). These two concentric circles can be interpreted either as the inner and outer sides of a single wall pipe, or as a double wall pipe. Drawing P201, photos 7 and 8, showed six horizontal pipes outside Building 400 that turned vertically to a concrete road, above

3

which blue sleeves surrounded five of the six pipes. A note associated with photos 7 and 8 stated: "piping to be removed and replaced with new." (R4, tab 3 at 178)

12. On 26 August 2010, CO Gill gave Tri-County notice to proceed with the on-site work (R4, tab 21).

13. The parties bilaterally modified the contract 5 times, ultimately extending the contract completion date by 162 days to 13 May 2011. Each modification included the following clause:

> Acceptance of this modification by the contractor
> constitutes an accord and satisfaction and represents
> payment in full for both time and money and for any and
> all costs, impact effect, and for delays and disruptions
> arising out of, or incidental to, the work as herein revised.

None of those modifications revised double wall piping work. (R4, tab 4 at 183-205)

14. From 14 September to 20 October 2010 Tri-County performed demolition (R4, tab 17 at 253-308).

15. On 14 October 2010 Tri-County sent transmittal No. 1 to Navy configuration manager Lorie M. Duplantier, with ten items of product data. She approved nine items, but for the "Steel Pipe ASTM A 53" item noted "not approved, still missing information on compliance w/ASME B31.3." (R4, tab 22 at 816)

16. On 20 October 2010 Tri-County resubmitted its "Steel Pipe ASTM A 53" transmittal No. 1 "Showing ASME B31.3 Compliance." Attached were product data sheets for "Standard Pipe Schedule 40 ASTM A 53" and "Extra Heavy Pipe Schedule 80 ASTM A 53." The Schedule 80 sheet showed single-wall pipes. Ms. Duplantier approved this transmittal, which requested no variances from the specifications. (R4, tab 25 at 914-17)

17. On 5 November 2011 piping was delivered to the NCBC site. On 16 November 2010 Tri-County began to install overhead piping in Building 400. (R4, tab 17 at 335, 340-41) Mr. Hunter of Tri-County saw that the piping that had come out of the ground during demolition was not the same as the piping it had in stock, reviewed the specifications and saw that they called for double wall piping (tr. 1/73).

18. On 1 December 2010 Tri-County sent Ms. Duplantier Request for Information (RFI) No. 011, which cited drawing P105, note 2, "double wall pipe" and stated: "After inspection of the piping protruding from the u/g [underground] locations, from the tank farm to the…parts room, it appears that there is a containment

4

sleeve over the steel piping. There is no description of a containment for the u/g piping." (Ex. A-4 at 66-67)

19. On 7 December 2010 Ms. Duplantier told Tri-County, "In reference to RFI 11...the sleeve is not a containment sleeve but a protective sleeve to protect any bonding from/to the piping. It can be a commercial grade sleeve (these usually come in a blue color.)." Tri-County added the following to RFI 011 on that same date: "By our observation(s), the plans & specs do not show details of the U/G pipes; Please clarify & provide us w/the specifications & details for the U/G pipe. Can you please tell us what you mean by Double Wall Pipe referenced in NEW WORK NOTES/NOTE:2, P105?" (R4, tab 26 at 919, 921)

20. On 8 December 2010 Ms. Duplantier sent the 7 December 2010 RFI 011 to HHMA, stating: "The contractors [need] clarification of the double walled piping.... Could you clarify what is required of this and/or provide specifications for it?" HHMA forwarded this request to Peterson Engineering. (R4, tab 27 at 922, 925)

21. On 10 December 2010 Peterson's Anita Sanford, who had designed the fuel piping work on the Building 400 project, sent HHMA an email stating:

UNDERGROUND PIPE NOTES:

The underground piping shall be double wall piping. The carrier pipe shall be A53 welded black steel schedule 40 pipe. The inner pipe [carrier pipe] shall be aligned and supported within the [outer] casing at approximately 10 feet on center.... The outer casing shall be black steel...sized to provide an adequate annular space between the outer surface of the carrier pipe material and the interior surface of the casing.... Pipe shall be buried a minimum of 24" from top of pipe to grade.

and added the following sketch:

5



## UNDERGROUND PIPING DETAIL
### NO SCALE

(R4, tab 28 at 926, 929; tr. 2/51-52) Ms. Duplantier forwarded Peterson's foregoing information to Tri-County on 31 December 2010 (R4, tab 29 at 930-31).

22. Tri-County's 11 January 2011 Transmittal Nos. 25 and 26 proposed a price of $51,203.17 for 1,020 feet of 6" schedule 80 PVC containment pipe for the underground pipe lines (R4, tab 33 at 938-42). HHMA reviewed those transmittals and on 12 January 2011 advised CO Gill that:

> It would be acceptable to use a PVC type containment pipe as long as it is manufactured for that purpose.... Also it is not clear how the contractor would get the steel carrier pipe into the containment pipe at the elbows.
>
> ....
>
> A couple of manufacturers that sell these double wall systems are Perma-Pipe and Rovanco.

(R4, tab 34 at 948) On 13 January 2011 CO Gill sent HHMA's comments to Tri-County (R4, tab 35)

23. Tri-County's 8 February 2011 transmittal No. 32 proposed Rovanco Steel Containment piping, which was approved on 9 February 2011 (R4, tab 41 at 975, tab 42 at 978, 980). Tri-County's transmittal No. 32-A of 15 February 2011 forwarded Rovanco shop drawings for the underground piping to NAVFAC, which were

6

reviewed and marked "Furnish as Corrected" on 17 February 2011 (R4, tab 43 at 981-83, tab 44 at 984-91).

24. Mr. Hunter did not include the cost of double wall piping in his proposal and thus he sought to prepare and file a request for an equitable adjustment (REA). CO Gill walked Mr. Hunter through the process of how to prepare an REA (tr. 1/54-55). This would be the first REA Tri-County submitted on a federal contract (tr. 1/24). Tri-County's 25 February 2011 email to CO Gill with attachments requested a $156,150.80 equitable adjustment for "Direct Materials" for underground double wall piping at Building 400 and 49 days delay citing the DFARS 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) clause and sent a DFARS 252.243-7002 certification for an REA (R4, tab 46 at 1006-12).

25. On 3 March 2011 Tri-County ordered 1,000 feet of Rovanco piping and accessories for the price of $37,900.00 (R4, tab 47 at 1014), which Rovanco delivered to the site on 16 March 2011 (R4, tab 17 at 576), and which Tri-County installed from 28 March to 6 April 2011 (R4, tab 17 at 600, 619).

26. The undated letter, Ser. ACQ/009, of Renee M. Comfort, NAVFAC Southeast Chief of Contracts, stated that she received Tri-County's claim on 22 April 2011, advised Tri-County "that your claim has some merit" and was "remanded to PWD [Public Works Department] Gulfport to facilitate negotiations regarding the appropriate price adjustment associated with the specification ambiguity" (R4, tab 7).

27. Ms. Comfort's 24 October 2011 letter forwarded Tri-County's 25 February 2011 email (*see* finding 24) to CO Gill, analyzed the contract specification and drawings with respect to underground piping and stated that on her review, "the contractor's position is found to have merit" (R4, tab 8). Ms. Comfort thought that "there was some misunderstanding or something that could possibly be misunderstood or misconstrued in the documents." She expected Gulfport to identify the problem, "develop[] an independent government estimate" of the monetary value of that issue and "[try] to reach an agreement for a fair and reasonable price" for the REA. (Tr. 2/78-79)

28. Between 2 October and 8 November 2011, CO Bennie Boren and Mr. Hunter met to settle Tri-County's $156,150.80 REA. The meeting was very short because Mr. Hunter lacked support information for the material cost and wanted to recover labor and overhead as well as material costs. (Tr. 2/25)

29. Tri-County's 8 November 2011 email to Mr. Boren revised the amount claimed to a $242,830.00 "cost for negotiation" for its underground piping claim, with a spreadsheet itemizing specialized labor, material, equipment, overhead rates and totals, but with no CDA claim certification (R4, tab 9 at 233-34).

7

30. NAVFAC contract specialist Larry McNutt's 14 November 2011 email to Tri-County stated that the government considered the $242,830 request to be a "new claim," provided Tri-County the FAR 33.207(c) certification language and required further supporting documentation (R4, tab 10).

31. On or about 12 December 2011 Mr. Hunter submitted to PWD Gulfport a "FINAL" invoice for the $9,676.85 contract balance (R4, tab 11 at 236-37).

32. Mr. Boren's 15 December 2011 email to Tri-County stated:

> I have received your final invoice, however the Final
> Release was not attached.… If you complete the attached
> and return we can process the invoice. If, however, you
> elect not to sign the attached, please advise and we will
> reject the invoice back to you. You can then resubmit
> leaving $100.00 on the contract until you are ready to
> submit a final release.

(R4, tab 12 at 238)

33. On 15 December 2011 Tri-County sent a release signed by Mr. Hunter stating that Tri-County acknowledged receipt of $667,344.30 in payments under the contract, that $9,676.85 remained to be paid and that "the undersigned Contractor does, and by the receipt of said sum shall, for itself, its successors and assigns, remise, release and forever discharge the Government…of and from all liabilities, obligations and claims whatsoever in law and in equity under or arising out of said contract." Tri-County reserved no claim against the government from the foregoing release. (R4, tab 13 at 240, 242)

34. On 17 January 2012, the government paid the $9,676.85 balance to Tri-County (R4, tab 14).

35. Ms. Comfort was surprised by Mr. McNutt's 7 February 2012 news of Tri-County's release without reservation and receipt of final payment. Because it didn't seem quite fair or reasonable that a person would claim entitlement to more than $150,000 and compromise that for $9,000, and to make sure that Tri-County "fully understood what [it] was doing," on 23 February 2012 Ms. Comfort asked Mr. McNutt: "Why did they submit a final release? Did we ask them to? Was it a company principal that signed [the] Final release? Do we have evidence of trying to negotiate the first claim?" (R4, tab 77 at 1435-36; tr. 2/81-82, 87)

8

36. Mr. Boren's answers to the foregoing questions included his 15 December 2011 email (finding 32), stated that Tri-County's owner signed the release and that:

> A meeting was held once we received [Ms. Comfort's] Letter…stating for us to negotiate with Tri-County. They were advised…to prepare an estimate and submit for the material cost only, as that [was] the extent of the REA. They claimed that [the] material…cost more money tha[n] the material they originally purchased…. When they submitted their proposal on 8 November 2011, it went up to $242,830.00, which now included Labor, Material, Equipment and Overhead which was caused by the piping delay.

(R4, tab 78 at 1438) Ms. Comfort said that these "answers were reasonable" (tr. 2/83).

37. Ms. Comfort's 15 March 2012 letter to Tri-County stated that the FAR 52.232-5(h)(3), PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) and 52.243-4, CHANGES (JUN 2007), clauses, do not allow payment of contractor claims not specifically exempted from the operation of the contractor's final release; Tri-County had reserved no claim in, and respondent had made final payment to Tri-County based on, such release; and therefore "[a]s a result of this, no further adjustments may be made to this contract." (R4, tab 14 at 244-45)

38. The 23 May 2012 letter of attorney Precious T. Martin, Sr., to NCBC's Mr. Boren submitted Tri-County's $242,830.00 claim to NAVFAC, attached Tri-County's earlier documents on the claim and included a proper CDA certification signed by Mr. Hunter on 25 May 2012 (R4, tab 15 at 246-47).

39. Mr. Boren's 30 May 2012 letter to Mr. Martin, over the title "Contracting Officer," stated that "no further adjustments may be made to this contract" and did not decide Tri-County's claim (R4, tab 16 at 249-51).

40. When the government interrogated Mr. Hunter at the hearing with respect to his signing the final release, he stated that he understood the meaning of the phrase "release and forever discharge the government." But in this contract he "had no intention of releasing the government from my claim and I never had no idea that this [release] was tied to the equitable adjustment and the claim." (Tr. 1/194) He stated that in previous federal agency contracts he had signed releases when receiving final payments, "but I never filed a equitable adjustment claim…against the government" under those contracts (tr. 1/195). Government counsel asked Mr. Hunter:

9

Q And is it your testimony that you did not understand what you were signing in the final release?

A The government knew that I didn't understand that. I mean Mr. Boren...knew that we didn't understand that. Ain't no way...I would have signed away for $7,000 of my claim...that made no sense."

(Tr. 1/197)

41. On 1 June 2012 Tri-County appealed from the CO's 30 May 2012 letter 089UJH7 declining to decide Tri-County's 25 May 2012 $242,830 certified claim (*see* finding 39), which appeal was docketed as ASBCA No. 58167.

## DECISION

Although CO Boren declined to decide Tri-County's certified claim on 30 May 2012 (finding 39), a refusal to decide a contractor's claim is itself an appealable decision. *See Leader Manufacturing Co.*, ASBCA No. 4416, 58-2 BCA ¶ 1877 at 7540.

This appeal presents three issues. First, was Tri-County's representation in its 30 June 2010 proposal that it had not been proposed for debarment, fraud in the inducement rendering Contract No. N69450-10-C-3597 void or voidable *ab initio*? Second, did Tri-County's 15 December 2011 release without reservation bar recovery for its 23 May 2012 claim (*see* finding 38)? Third, if not, is Tri-County entitled to recover on such claim?

I.

Respondent's amended answer added the affirmative defense of "Fraud in the Inducement," alleging that Tri-County's 30 June 2010 proposal misrepresented that it was "not (X) presently...proposed for debarment," despite the fact that in early 2010 the U.S. Department of Labor (DOL) had proposed to debar Tri-County for violating the Service Contract Act and a hearing had been held on the matter on 22-23 April 2010 (gov't amended answer at 4-6).

A contract is void or voidable when its award resulted from a misrepresentation in the contractor's bid. *See J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200-01 (Fed. Cir. 1988). To render a contract void or voidable: (1) the misrepresentation must have been either fraudulent or material; (2) the misrepresentation must have induced the recipient to make the contract; and (3) the recipient must have been justified in relying on the misrepresentation. *See Servicios y Obras Isetan S.L.,*

10

ASBCA No. 57584, 13 BCA ¶ 35,279 at 173,162 (citing RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981)).

Mr. Hunter disclosed DOL's April 2010 proposed debarment of Tri-State to CO Gill. CO Gill told Hunter that "you're not debarred. And so I don't care about the rest. I got to get this contract awarded." CO Gill did not testify. (Findings 1, 4) Therefore, RESTATEMENT (SECOND) OF CONTRACTS § 164(1) elements (2) and (3) of misrepresentation were not proven. We hold that Mr. Hunter's disclosure of DOL's proposed debarment to CO Gill was sufficient to defeat the government's defense, and the government has not sustained its burden of proving fraud in the inducement.

II.

As summarized in *J.G. Watts Construction Co. v. United States*, 161 Ct. Cl. 801, 805-06 (1963): "Both the Supreme Court and [the Court of Claims] have long held that…claims, where not excepted from the provisions of a release, are…effectively barred" (citing *United States v. Wm. Cramp & Sons Co.*, 206 U.S. 118, 126-28 (1907) (rule barring claims applied to a "final release" executed after completion and delivery of the battleship Indiana)). There are special and limited situations in which such a claim may be prosecuted despite the execution of a general release. *Watts*, 161 Ct. Cl. at 807. Those situations include economic duress, fraud, mutual mistake, obvious unilateral mistake, and plain conduct indicating post-release consideration of a claim. *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1395 (Fed. Cir. 1987).

A claim of unilateral mistake of which the other party did not know or have reason to know will not invalidate a general (final) release. *See H.L.C. & Associates Construction Co. v. United States*, 367 F.2d 586, 591-92 (Ct. Cl. 1966) (rule applied to general release). However, when the government knows or has reason to know of a contractor's unilateral mistake, a general or final release will not bar its unreserved claim. *See DMS*, ASBCA No. 45723, 95-1 BCA ¶ 27,367 at 136,367 (summary judgment denied because record was unclear whether the oral phrase "in reviso," known to the government with respect to contractor's final release, meant it reserved its claim). "The circumstances surrounding the signing of the release will be reviewed to effect the true intent of the parties." *Hibbitts Construction Co.*, ASBCA No. 37070, 90-1 BCA ¶ 22,598 at 113,392. "[T]he contemporaneous actions of the parties are of great weight in reaching a conclusion as to their intention." *Maintenance Engineers*, ASBCA No. 23131, 81-2 BCA ¶ 15,168 at 75,073.

Tri-County contends that Mr. Hunter signed the 15 December 2011 general release without reserving the claim in dispute by mistake or oversight that was known to the CO (app. br. at 9-11). Respondent does not discuss whether, or deny that, Ms. Comfort, CO Boren and CO Gill knew or had reason to know of

11

Tri-County's mistake in failing to reserve or except its 25 February 2011 REA or its 8 November 2011 claim in the 15 December 2011 release (gov't br. at 37-39; gov't reply br. at 6-7, 9).

The parties both knew that Tri-County had submitted its 25 February 2011 REA for $156,150.80 for the underground double wall piping (findings 24, 26)[2]. Both parties knew that on 12 December 2011 Tri-County submitted a "FINAL" invoice in the amount of $9,676.85 for the contract balance (finding 31) and, upon CO Boren's request, on 15 December 2011 Tri-County submitted a release of the government from all claims and liabilities under or arising from the contract, reserving no claim (finding 32).

In December 2011 and up to 17 January 2012, when the government paid the $9,676.85 contract balance to Tri-County (finding 34), Tri-County had not expressly stated to the NCBC COs its intention not to release the REA in the 15 December 2011 release, as Mr. Hunter testified later in litigation (finding 40). Nevertheless, there is unopposed evidence that the NCBC COs knew or should have known of Mr. Hunter's mistaken understanding of the effect of a final release.

In its prior federal contracts Mr. Hunter signed final releases to "obtain the small final payments due," but under those contracts Tri-County had no pending REA or claim (finding 40). Tri-County's 25 February 2011 REA was the first REA it had submitted under its federal contracts, and CO Gill walked Mr. Hunter through the process of preparing an REA (finding 24). Ms. Comfort, NAVFAC Southeast Chief of Contracts (finding 26), was surprised by Tri-County's release without reservation of its REA because it didn't seem reasonable to compromise a $150,000 claim for $9,000. She asked the NCBC COs why Tri-County had signed the release and found CO Boren's answers to her questions "reasonable." (Findings 35-36) Moreover, conspicuously absent from Ms. Comfort's questions and CO Boren's answers was whether the COs had asked Mr. Hunter if he knew and intended that his 15 December 2011 final release would bar recovery on his $156,150 REA. Respondent does not deny that Ms. Comfort, CO Boren and CO Gill knew or had reason to know of Tri-County's mistake in failing to reserve or except its 25 February 2011 REA or its 8 November 2011 claim in the 15 December 2011 release (gov't br. at 37-39; gov't reply br. at 6-7, 9). The foregoing circumstances are of great weight in concluding that COs Gill and Boren knew or should have known that Tri-County had made a unilateral mistake by omitting to reserve its $156,150 REA from its final release.

---

[2] Despite the absence of the required FAR 52.243-4, CHANGES (JUN 2007) clause from this construction contract (finding 7), such clause may be deemed included pursuant to *G.L. Christian & Associates v. United States*, 312 F.2d 418, 426 (Ct. Cl.), *cert. denied*, 375 U.S. 954 (1963).

We hold that such circumstances constitute a special and limited situation in which a claim may be prosecuted despite the execution of a general or final release.

III.

Tri-County bases its REA and certified claim on the lack of "details" to specify double wall piping, the government's 10 December 2010 clarifying "UNDERGROUND PIPE NOTES" and attached piping sketch that provided the missing details, and on Ms. Comfort's admission that Tri-County's REA had some merit (app. br. at 8-9). Respondent argues that its solicitation and contract with Tri-County made it clear that double wall piping was required for underground installation (gov't br. at 18-20).

The pertinent rules for interpreting disputed contract terms are well established. "The threshold question…is whether the plain language of the contract 'supports only one reading or supports more than one reading and is ambiguous.'" *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "A contract term is unambiguous if there is only one reasonable interpretation [of such term]." *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705, (Fed. Cir. 1986). The tribunal must then determine whether the ambiguity is patent. An ambiguity is patent if it is "so glaring as to raise a duty to inquire[.]" *Newsom v. United States*, 676 F.2d 647, 649-50 (Ct. Cl. 1982). If a patent ambiguity exists, the contractor is obliged to seek clarification timely. *See Beacon Construction Co. of Massachusetts v. United States*, 314 F.2d 501, 504 (Ct. Cl. 1963). To a contractor's argument that it was unaware of a patent ambiguity at the time it bid, the court held that "the presence or absence of a patent ambiguity is not determined by the contractor's actual knowledge, but rather by what a reasonable contractor would have perceived in studying the bid packet." *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997).

We have found that the solicitation and Tri-County's contract specified new double wall piping for underground (but not for overhead) installation (findings 8-11) and determine that those specifications are unambiguous. However, if we were to accept, *arguendo*, Tri-County's contention that the solicitation and contract were ambiguous or unclear because they did not distinguish, by definition or detail depiction, single and double wall piping, such putative ambiguity was patent, not latent. If Tri-County did not know the difference between double and single wall piping, it had the duty to seek clarification before contract award. We hold that Tri-County's failure to inquire about double wall piping before contract award bars recovery on its claim.[3] *Triax Pacific,* 130 F.3d at 1475.

---

[3] Given our foregoing holding, we need not address or decide respondent's defenses of accord and satisfaction and gross claim misrepresentations.

13

## CONCLUSION

We deny the appeal.

Dated: 16 June 2015

DAVID W. JAMES, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58167, Appeal of Tri-County Contractors, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

14