# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
KiewitPhelps )   ASBCA No. 61197
)
Under Contract No. W9128F-12-C-0023 )

APPEARANCES FOR THE APPELLANT:   Vivian Katsantonis, Esq.
Christopher M. Harris, Esq.
  Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
  McLean, VA

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Thomas J. Ingram, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, Omaha

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

This appeal arises from the contract to construct a five-level, one million square foot facility to replace the U.S. Strategic Command (STRATCOM) complex at Offutt Air Force Base (OAFB) near Omaha, Nebraska. Specifically, this appeal deals with a dispute over wallboard (gypsum board) finishing requirements throughout the buildings. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We sustain the appeal.

## FINDINGS OF FACT

*Finishing vs. Finishes*

1. Mr. Douglass is an operations manager for Hensel Phelps, one of the joint venture partners Kiewit and Hensel Phelps making up KiewitPhelps (KP). He had overall responsibility for this project. (Tr. 1/51-53) Mr. Douglass explained that drywall finishing is "used synonymously with the terminology of how you apply joint tape and drywall compound to the drywall to prepare it for decoration." He distinguished "drywall finishing" from "finishes" that are typically paint, wall covering or anything that would architecturally treat the wall surface. (Tr. 1/63) Mr. Douglass explained there are six levels of drywall finishing starting with zero which is blank drywall, Level 1 which is "fire-taping" up to Level 5 which is the highest level with the most applications of joint compound. Each successive level builds on the previous level of joint taping and the application of joint compound.

There are seven levels of "finishes" for different kinds of paint, wall coverings, wood panels, etc. (Tr. 1/64-65, 69) This similar terminology for different products can cause confusion as can be seen in the bidder inquiry discussed below.

*Pre-Award Bidder Inquiry*

2. Bidder Inquiry No. 4179969 was submitted on September 14, 2011, and read "Spec section 09 29 00 identifies various drywall finish levels (Level 1-7). Please identify where each finish level is to be applied." The government response was:

> Provide Level 4 throughout facility unless noted otherwise. Provide Level 5 at the following locations: Primary Corridors (adjacent to: elevators, restrooms, break areas, atrium, auditorium, directorate areas), Walls with wood trim and/or panels, Walls and/or ceilings with direct sunlight [o]n surface. Walls with applied solid surfaces. These areas will be clarified in an upcoming amendment.

(Supp. R4, tab 3; app. supp. R4, tab 34 at 2-3) Mr. Hailey is an architect working for architectural firm HDR on the STRATCOM replacement facility project since 2008 (tr. 2/204). Mr. Hailey wrote the government response to Bidder Inquiry No. 4179969 (tr. 2/222-24). Mr. Hailey explained that Levels 1-7 are paint levels not drywall finish levels and the inquiry cited the wrong specification "should be 0990, not 0929" (tr. 2/225-26, 271). His response told the bidders where to put the paint in terms of drywall finish (tr. 2/271, 273-74).

3. In her final decision, contracting officer (CO) Young stated, "The contract provisions dealing with drywall finishes, though atypical, are clear and unambiguous, and generated no bidder inquiries" (R4, disc 1, tab 1 at 11).

*KP's Drywall Subcontractor Bids & Trade Practice*

4. KP's drywall subcontractor, Cleveland Construction, Inc. (CCI), did not bid finishing to Level 4 above ceilings and below floors (tr. 1/223; app. supp. R4, tab 19 at 1). In addition to CCI, three other drywall subcontractors submitted bids to KP for drywall work. Each bidder interpreted the drywall specifications the same as CCI that Level 4/5 finish was required for exposed walls and fire-taping or Level 1 finishing was required above ceilings (tr. 1/79-82). Allied Construction Services, Inc., wrote "Exposed drywall finished to G.A. level 4" and "Rated drywall above the ceiling finished to G.A. level 1" (app. supp. R4, tab 23 at 2). Midwest Drywall Co., Inc., wrote "Level 4 and 5 finishes at exposed drywall, fire-tape above ceilings" (app. supp. R4, tab 24 at 2). Stowell Co., Inc., wrote "Level 4 finish, typical on all exposed walls

2

and ceilings, level 1 above ceiling on rated walls. Level 5 finish per Addendum." (App. supp. R4, tab 25 at 1)

5. Mr. Stayer has been employed by CCI for 38 years and is now CCI's vice president of the interior division (tr. 1/256). He testified that the industry standard practice is to apply Level 1 (fire-taping) finish above ceilings and below floors and Level 4 or 5 where decoration is to be applied (tr. 1/256-57).

*Contract Award*

6. On August 16, 2012, the United States Army Corps of Engineers (USACE) awarded KP Contract No. W9128F-12-C-0023 for $524,445,324 to construct the STRATCOM replacement facility at OAFB (R4, disc 1, tab 3b). Part of the contract involved finishing gypsum wallboard (drywall). The drywall work was subcontracted to CCI for approximately $16 million. (Tr. 1/79, 218-19)

*Sensitive Compartmented Information Facility (SCIF) – DCID 6/9*

7. HDR Architecture (HDR) was the designer of the project. HDR prepared the drawings and produced the contract specifications. (Tr. 2/159-60, 204) The STRATCOM facility included SCIF space. Mr. Hailey and HDR utilized DCID 6/9 to satisfy the SCIF requirements and that included requiring only Levels 4 and 5 drywall finish (tr. 2/210). Mr. Hailey placed Note 10 on Architectural Drawing A-702A, Interior Wall Type Details, that read, "SCIF – IAW DIRECTOR OF CENTRAL INTELLIGENCE DIRECTIVE NO. 6/9, NOV. 2002" (DCID 6/9) (R4, disc 3, tab 2c, vol. 3 at 379). Concerning drywall construction DCID 6/9 provides:

> 4.2 SCIF Criteria For Permanent Dry Wall Construction
>
> Walls, floor and ceiling will be permanently constructed and attached to each other. To provide visual evidence of attempted entry, all construction, to include above the false ceiling and below a raised floor, must be done in such a manner as to provide visual evidence of unauthorized penetration.

(App. supp. R4, tab 71 at 15) DCID 6/9 does not specify how the contractor should achieve the finish to "provide visual evidence of unauthorized penetration" (tr. 2/230-31). Mr. Hailey testified that Mr. DeRuiter was STRATCOM's security manager (tr. 2/206). Mr. DeRuiter wanted painted walls to be painted true floor to true ceiling (tr. 2/245). Mr. Hailey testified that he relied on Mr. DeRuiter's interpretation of what DCID 6/9 required on SCIF walls (tr. 2/245, 247).

3

8. Mr. Flere was the contracting officer's representative (COR) and quality assurance lead for the supervisory civil engineer on the STRATCOM project. He has been on the project since its inception. (Tr. 3/5-6; app. supp. R4, tab 76) COR Flere testified that DCID 6/9 did not require higher finish levels above ceilings and below floors (tr. 3/45). He has never seen Level 4 finish required above ceilings and below floors (tr. 3/46).

*Sensitive Compartmented Information Facility (SCIF) – ICD 705 & ICS 705-1*

9. The contract specifications included section 01 32 52. 02 24, Special Security. This section incorporated ICD 705 (May 2010) Intelligence Community Directive Number 705 – Sensitive Compartmented Information Facilities and ICS 705-1 (September 2010) Intelligence Community Standard Number 705-1 - Physical and Technical Security Standards for Sensitive Compartmented Information Facilities by reference (R4, disc 2, tab 2b at 301).[1] ICD 705 rescinds DCID 6/9 including its manual and annexes (ICD 705 at 1). ICD 705 and ICS 705-1 each provide security standards for SCIFs (ICD 705 at 1; app. supp. R4, tab 72 at 1). Section 01 32 52. 02 24, subparagraph 1.10.1 read:

> 1.10.1    SCIF Finish Work Inspections
>
> Government [construction surveillance technicians] CST's will be observing all aspects of construction as it progresses. The CST's will observe all finish work within the SCIF areas, in accordance with ICD 705 and ICS 705-1. This includes the installation of drywall, flooring, ceiling, lighting, doors, cabinetry, painting, carpeting and all other finish work inside the SCIF areas. All wall, ceiling, and floor spaces within SCIF areas must be inspected by the CST's before closure of the space.

(R4, disc 2, tab 2b at 312-13)

10. ICD 705 does not include any direction relating to the wall finishes. ICS 705-1 includes the following:

> G.  Physical and Technical Security Standards
>
> 1. Physical Security for SCIFs

---

[1] ICS 705-1 is in the record (app. supp. R4, tab 72), ICD 705 is not. The Board requested that the parties submit ICD 705 and ICS 705-1 to the Board for inclusion in the record.

4

a. Perimeter

....

(3) Walls, floor and ceiling shall be permanently and solidly constructed and attached to each other. Raised floors and false ceilings shall not be used to anchor wall support materials. All construction, to include above false ceilings and below a raised floor, shall be constructed to provide visual evidence of unauthorized penetration.

....

(6) Details for construction of the perimeter to meet standards shall be provided within the *IC Tech Spec* for SCIFs. [2]

(App. supp. R4, tab 72 at 4) ICS 705-1 does not specify how the contractor should achieve the finish to "provide visual evidence of unauthorized penetration."

*Specification Section 09 90 00 Paints and Coatings*

11. The contract's Technical Specifications included Division 09 – Finishes, section 09 90 00, Paints and Coatings, that identifies locations where painting is excluded:

1.10.2 Painting Excluded

Do not paint the following unless indicated otherwise.

a. Surfaces concealed and made inaccessible by panelboards, fixed ductwork, machinery, and equipment fixed in place.

---

[2] The record includes IC Tech Spec – for ICD/ICS 705 dated September 28, 2017 (app. supp. R4, tab 73). Chapter 3, Fixed Facility SCIF Construction, paragraph C., Perimeter Wall Construction Criteria, subparagraphs 2., 3.d)(5), 3.e)(6) each read "Entire wall assembly shall be finished and painted from true floor to true ceiling" (app. supp. R4, tab 73 at 22-23). This document is dated after award of the contract on August 16, 2012. We cannot say there was an earlier version applicable to this contract and therefore we do not deal with the IC Tech Spec in this decision.

5

      b. Surfaces in concealed spaces. Concealed spaces are defined as enclosed spaces above suspended ceilings, furred spaces, attic spaces, crawl spaces, elevator shafts and chases.

(R4, disc 2, tab 2b at 2451, 2458)

*Specification Section 09 29 00 Gypsum Board*

12. Division 09 – Finishes, section 09 29 00, Gypsum Board, included, among other topics, the installation and finishing of gypsum wallboard (app. supp. R4, tab 1). This specification incorporates by reference ASTM C 840 (2008) Application and Finishing of Gypsum Board (*id.* at 3, 20-21), and GA 216 (2010) Application and Finishing of Gypsum Panel Products (*id.* at 4).

13. Section 09 29 00, paragraph 3.11, Wallboard Finishing, subparagraphs 3.11.1, .2 and .3 read:

      3.11.1      General

          1.      Treat gypsum board joints, interior angles, edge trim, control joints, penetrations, fastener heads, surface defects, and elsewhere as required to prepare gypsum board surfaces for decoration.

          2.      Promptly remove residual joint compound from adjacent surfaces.

      3.11.2      Pre-Fill

      Pre-fill open joints and voids, rounded or beveled edges and damages surface areas.

      3.11.3      Application

      Apply joint tape over gypsum board joints, except those with trim having flanges not intended for tape.

(App. supp. R4, tab 1 at 19-20)

14. Section 09 29 00, paragraph 3.11, Wallboard Finishing, subparagraph 3.11.6 reads:

3.11.6    Apply Joint Compound and Tape in accordance with fire-rated design

1.    Apply joint treatment compound in accordance with manufacturer's directions.

2.    Fill joints, screw heads, and internal corners with compound.

3.    Extend joint system vertically from floor to extent described as follows:

a.    Fire Walls, Barriers, and Partitions: Extend to full height of wall.
b.    Smoke Barriers and Partitions: Extend to full height of wall.
c.    Interior face of exterior wall (non-rated): Extend to full height of wall.
d.    Other interior partitions (non-rated): Extend to 6 inch above ceiling.

4.    Refer to Drawings for indication of partition heights.

(App. supp. R4, tab 1 at 20) Mr. Knight is Chief, Contract Administration Branch, Omaha District, USACE (tr. 2/164). He was also an administrative contracting officer (ACO) on the STRATCOM contract starting in late 2017 (tr. 2/176). ACO Knight testified that paragraph 3.11.6 provides for "level 1 fire-taping" (tr. 2/198). Mr. Douglass explained a Level 1 finish is "fire-taping" which is not used for decoration (tr. 1/69, 101). Mr. Hailey wrote section 3.11.6.3.d (tr. 2/215). He testified that section 3.11.6 "has nothing to do with the [drywall] finish level" it deals with fire rating (tr. 2/219).

15. Section 09 29 00, paragraph 3.11, Wallboard Finishing, subparagraph 3.11.7 reads:

3.11.7    Level 4 Finish

1.    Comply with ASTM C 840.

2.    After drying, sand or otherwise smooth final coat of compound as needed to eliminate high spots

7

or excess compound to leave smooth, even, and level surface.

3.      Draw down final coat of compound to a smooth even plane.

4.      Locations:

a.      Wallboard scheduled to be finished with Level 1 (flat) paint, textured coating, or wallcovering.
b.      Where above listed surfaces are to be finished with textured decorative treatments, wall covering, paneling, or wall guard.
c.      All remaining locations, unless noted otherwise.

(App. supp. R4, tab 1 at 20) Mr. Hailey wrote subparagraph 3.11.7.4.c. and testified that "All remaining locations, unless noted otherwise" was intended to make it clear that Level 4 finish was to be applied everywhere in the buildings including above ceilings and below floors (tr. 2/119, 252, 268). During cross-examination, Mr. Hailey was asked why in subparagraph 3.11.7.4.c. he did not specifically state Level 4 finish above ceilings and below floors. He testified "I didn't want to call it out." He was asked why but his explanation was confusing. (Tr. 2/258-59)

16. Section 09 29 00, paragraph 3.11, Wallboard Finishing, subparagraph 3.11.8 specifies similar requirements for Level 5 finish adding "Trowel skim coat of joint compound leaving a thin film covering the entire surface" (app. supp. R4, tab 1 at 21). Level 5 also listed applications and locations:

4.      Applications:

a.      Wall board scheduled to be finished with Level 2 (velvet), Level 3 (eggshell), Level 4 (satin), Level 5 (semi-gloss), Level 6 (gloss), Level 7 (high gloss), epoxy paint, or high build glazed coating.

b.      Surfaces using MRB or other wallboard types with a glass mat facer on finished side.

[Am 4]

c.      Locations:

8

> 1)　Primary corridors adjacent to: Elevators,
> Restroom, Break Areas, Atrium, Auditorium,
> and Directorate Areas.
> 2)　Walls with wood trim and/or wood panels.
> 3)　Walls and/or ceilings with direct sunlight
> on surface.
> 4)　Walls with applied solid surfaces.

[Am 4*]

(R4, disc 2, tab 2b at 2335)

*ASTM C 840*

17.　ASTM C 840, Standard Specification for Application and Finishing of Gypsum Board, defines finishing as "the preparation of gypsum board surfaces to receive the field application of decoration" (R4, disc 1, tab 3c. at 2, ¶ 3.2.9). Finished wallboard is defined as, "wallboard that has had the joints taped, has had the joints, fastener heads, and flanges of accessories concealed with joint compound, and has been sanded to prepare the surface to receive job applied decoration" (R4, disc 1, tab 3c. at 2, ¶ 3.2.8). Decoration is defined as, "paint (including primers), texture, coatings, and coverings such as wallpaper and sheet plastic materials designed to conceal or protect the surface of the gypsum board (see Appendix X3)" (R4, disc 1, tab 3c at 2, ¶ 3.2.3).

18.　ASTM C 840 paragraph 22, Finishing of Gypsum Wallboard, subparagraph 22.6, Levels of Finish, starts with Note 15 that states the level of finish can vary with the location in the structure, and "[t]he relationship of levels of finishing with location and intended decoration is described in Appendix X8." Subparagraph 22.6 defines six levels of finish identified as 0 through 5. (R4, disc 1, tab 3c. at 14) Level 0 requires no taping, no joint compound, essentially no finishing. Finish Levels 1 – 5 primarily deal with finishing joints and covering fastener heads and accessories. The primary difference between finish levels is the number of coats of joint compound applied. Level 1 requires that "all joints and interior angles shall have tape embedded in joint compound." Level 2 requires Level 1 finish with one coat of joint compound over fastener heads and accessories. Level 3 requires finish Level 2 with one additional coat of joint compound over joints, interior angles, and two coats over fastener heads and accessories. (*Id.*) Level 4 requires the following:

> 22.6.5 *Level 4*:
> 22.6.5.1　All joints and interior angles shall have
> tape embedded in joint compound and shall be
> immediately wiped with a joint knife or trowel leaving a
> thin coating of joint compound over all joints and interior

9

angles as described for Level 2.[3] Two separate coats of joint compound shall be applied over all flat joints. One separate coat of joint compound shall be applied over interior angles. Fastener heads and accessories shall be covered with three separate coats of joint compound. All joint compounds shall be smooth and free of tool marks and ridges (see 22.4.1).

(R4, disc 1, tab 3c at 14) ASTM C 840, 22.6.6 Level 5, 22.6.6.1 is the same as finish Level 4 except adding, "A thin skim coat of joint compound shall be trowel-applied to the entire surface" (*id.*).

19. ASTM C 840, 23 Decoration, paragraph 23.1 reads, "Surfaces finished to Levels 3, 4, or 5 shall be covered with a drywall primer compatible with the final decoration prior to the application of the final decoration" (R4, disc 1, tab 3c at 14). Mr. Douglass testified that drywall primer was a type of paint (tr. 1/99).

20. ASTM C 840, Appendix[4] X8 specifies where the six levels of gypsum wallboard finish are typically used. Level 1 is "Frequently used in plenum areas above ceilings, in attics, in areas where the assembly would generally be concealed." Level 2 is used "in garages, warehouse storage, or other similar areas where surface appearance is not of primary concern." Level 3 is "Used in appearance areas that are to receive heavy texture (spray or hand applied) finishes before final painting." Level 4 "should be used where wallcoverings, flat paints, or light textures are specified." Level 5 is the "highest quality finish" and is "required where gloss, semi-gloss, or enamel flat paints are specified." (R4, disc 1, tab 3c at 17-18)

*Gypsum Association (GA) 216 & 214*

21. GA 216 (2010), Application and Finishing of Gypsum Panel Products (app. supp. R4, tab 2 at 1, 17, 19), incorporates GA 214, Recommended Levels of Gypsum Board Finish (R4, disc 1, tab 3f at 2-3). Both GA 216 and GA 214 specify the same

---

[3] We are not sure why the reference to Level 2 because this sentence is identical to that in the first sentence of Level 2 (R4, disc 1, tab 3c at 14).

[4] The Appendixes introduction reads, "These Appendixes give general information and also suggestions for inclusions to be made elsewhere by the specifier. They are not part of this specification." (R4, disc 1 tab 3c at 15) However, Appendix X8 is referred to in paragraph 22.6 Levels of Finish, Note 15, "The relationship of levels of finishing with location and intended decoration is described in Appendix X8" (*id.* at 14). Therefore, we consider Appendix X8 as part of the specification in this contract.

levels of finish and typical use as specified in specification section 09 29 00 and ASTM C 840 discussed above.

*Construction Preparatory Meeting*

22. A construction preparatory meeting was held on October 3, 2014, dealing with "Non-Structural Framing and Drywall" (tr. 1/179-80, 191; app. supp. R4, tab 69 at 1). Mr. Wright, Mr. Mark Halbleib, CCI project manager, and various representatives from USACE quality assurance (QA) attended. These USACE attendees were all involved in drywall inspections. (*Id.*) During the meeting the plans/specifications relevant to performance were discussed (tr. 1/181-82). The Meeting Agenda included Means and Methods relating to drywall:

> Contractor Description of Work and Installation Sequence
>
> ....
>
> 09 29 00 Gypsum Board & Insulation
> - 1. Wall close in inspection must be complete
> - 2. One side the Drywall to 6" above ceiling line[5]
> - 3. Install Insulation
> - 4. Install drywall on other side
> - 5. Tape joints above ceiling
> - 6. Full tape and sanding of joints per wall schedule

(App. supp. R4, tab 69 at 3) Mr. Wright explained that paragraph 5, "Tape joints above ceiling" was fire-taping the joints only (tr. 1/186). Paragraph 6, "Full tape and sanding of joints per wall schedule" refers to the visible wall space in the rooms (tr. 1/186-87). Mr. Wright explained that sequencing the work was critical and that all of the drywall work had to be completed and inspected before the overhead MEP[6] can be installed (tr. 1/184-85, 197).

---

[5] Number 2 caught our eye, but KP did not introduce testimony to explain the 6 inches so we conclude it must not be relevant to the height of drywall finish involved in this appeal.

[6] "MEP" is not defined in the record but we understand it to refer to the mechanical electrical, and plumbing equipment installed above the ceiling.

11

23. The Room Finish Schedule includes the wall finish schedule (north, east, south, west) and ceiling material and height. The codes identify what finish[7] (paint) goes on the walls and the ceiling height is ten feet. (R4, disc 2, tab 2b at 2257-99; tr. 1/187-88) There is nothing in the "wall schedule" that specifies any decoration (paint) above the ceilings (tr. 1/188-90). During the meeting the USACE QA inspectors did not raise the subject of Level 4 finishing above ceilings (tr.1/191).

*The Contracting Officer's Representative (COR)*

24. Paragraph 2.a. of COR Flere's designation letter required him to:

> Verify that the contractor performs the technical requirements of the contract in accordance with the contract terms, conditions and specifications. Specific emphasis should be placed on the quality provisions, for both adherence to the contract provisions and to the contractor's own quality control program.

(App. supp. R4, tab 76 at 1)

*Modification Nos. R00182, R00225 & R00211 – Credits for Lowering Ceilings*

25. Modification No. R00225[8], dated May 28, 2015, changed the "LL2" ceiling height (app. supp. R4, tab 51 at 1, 3-4). KP negotiated a price reduction for drywall finishing (joint compound, joint tape) for lowering the ceiling (*id.* at 46). Modification No. R00182,[9] dated August 6, 2015, changed the ceiling height at "LL1 of MSB." The ceiling was lowered from 10 feet to 9 feet, 4 inches. (App. supp. R4, tab 45 at 1, 4) The Prenegotiation Objective Memorandum (POM) documents that USACE intended to ask CCI "to include a credit for wall board finishes (Level 4 or Level 5) and painting, as a result of the majority of corridor ceilings being 8-inches lower" (*id.* at 119). Unilateral Modification No. R00211, dated February 3, 2016, lowered ceiling heights in "L1-L3" (app. supp. R4, tab 50 at 1, 3, 17).

26. Mr. Douglass testified that in the modifications lowering ceiling heights the government required credits for less Level 4 finish work which KP included in the

---

[7] Finish on the wall schedule does not refer to drywall finish (tr. 1/189).

[8] Although the cover sheet identifies Modification No. R00225, the SF-30 identifies Modification No. A00342 (app. supp. R4, tab 51 at 1, 3-4). The difference is not explained in the record.

[9] Although the cover sheet identifies Modification No. R00182, the SF-30 identifies Modification No. A00387 (app. supp. R4, tab 45 at 1, 3). The difference is not explained in the record.

modifications. He believes this is consistent with KP's interpretation that Level 4 finish is not required in concealed spaces. (Tr. 1/121-22) Mr. Fulks was project manager for CCI from the very beginning of CCI's contract (tr. 1/217-19). He negotiated the modifications lowering ceiling heights that reduced the amount of decoration (paint) and increased the amount of fire-taping/Level 1 finish above the ceilings (tr. 1/226-28). USACE requested that CCI give a credit as a result of these changes because it would have less Level 4 drywall finishing to do and a credit was included in Modification No. R00182 (tr. 1/233, 235-44). The same was true for Modification Nos. R00225 and R00211 (tr. 1/248-51). Mr. Fulks testified that based on the modifications lowering the ceiling height and USACE's demands for credits that USACE understood that only fire-taping (Level 1) finish was required above ceilings and Level 4 was required below ceilings (tr. 1/248).

27. CO Young testified about the modifications lowering the ceilings. She knew that CCI provided credits for less drywall finishing and painting (app. supp. R4, tab 45 at 93-94, 119, tab 106; tr. 2/93-97, 107). CO Young agreed that asking for a credit was inconsistent with her current position that Level 4 finishing was required above ceilings and below floors (tr. 2/86-89, 99-100). CO Young testified that she now believes the credits should not have been taken (tr. 2/113, 115-16).

*Mock-Up Room*

28. KP constructed a mock-up room that served as the standard for work on the project going forward (tr. 1/208). The room was pre-inspected by KP and its relevant subcontractors during early February 2016 and inspected by USACE on February 8, 2016[10] (tr. 1/211; app. supp. R4, tab 16 at 1). The inspection sheet was signed off by Mr. Truitt, USACE inspector, indicating approval on February 18, 2016 (tr. 1/211-12; app. supp. R4, tab 16 at 1). USACE did not require Level 4 finish above ceilings in the mock-up room (tr. 1/209-12; app. supp. R4, tab 16 at 24).

*Inspections before June 2016*

29. COR Flere testified that due to initial quality problems, USACE conducted 100% inspection of the wall partitions (tr. 3/35). If the USACE inspector found that the work was not being performed consistent with the specifications the contractor doing the work would be informed (tr. 3/37). COR Flere agreed that before June 2016, USACE inspectors believed that what CCI was doing above ceilings and below floors was acceptable (tr. 3/43). KP, CCI and USACE inspectors shared the same understanding that Level 4 finishing was not required above ceilings and below floors up until June 2016 (tr. 3/45). The wallboard work had to be inspected and approved before MEP could start to be installed above the ceiling level (tr. 3/43).

---

[10] There is no explanation in the record of why the mock-up room was constructed in early 2016 when drywall work started in late 2014 (tr. 1/176-77).

30. Mr. Wright was an area supervisor for Hensel Phelps on the STRATCOM project. He was responsible for all safety, quality, construction-related scheduling, logistic and daily problem solving. He would attend USACE inspections during the project. (Tr. 1/176) Drywall inspections started in October/November 2014 and Mr. Wright oversaw CCI the drywall contractor's work (tr. 1/176-77). He recalled government inspectors were on the project every day (id.). The drywall work had to be inspected and approved before the installation of the mechanical systems above the architectural ceilings and below raised floors (tr. 1/76-77, 191-92; app. supp. R4, tab 69 at 14). The wall inspections were very thorough and there is no way an inspector could mistake fire-taping for a Level 4 drywall finish (tr. 1/198). Before June 2016, USACE inspectors did not bring up the issue of Level 4 finish above ceilings and below floors (tr. 1/198-99, 213-15).

31. Mr. Fulks was on site four days a week (tr. 1/219-20). Mr. Fulks testified that the Level 4 drywall finish issue did not arise until June 2016 (tr. 1/221-22). Prior to that time CCI was providing a Level 1 finish, which was fire-taping, above ceilings (tr. 1/222-23, 227). USACE conducted 100% inspection of drywall and never raised the Level 4 finish requirement before June 2016 (tr. 1/224-26).

32. Mr. Stayer testified that CCI initially applied a Level 1 finish above ceilings and below floors and Level 4 or 5 between the floors and ceilings (tr. 1/259). Mr. Stayer discussed a photograph USACE put in its Rule 4. The picture shows a wall with Level 4 finish on vertical joints up to a horizontal line and Level 1 finish on the horizontal joint and vertical joints above. As Mr. Stayer explained, the difference between Level 4 and Level 1 is obvious. (Tr. 1/267-68; supp. R4, tab 1 supp. photos, 1b)

33. LTC Sexton was assigned as deputy commander for the STRATCOM project in May 2016 (tr. 1/143-45). LTC Sexton testified that when he arrived in May 2016 a "significant portion" of the overhead utilities and under floor "stuff" was installed when he first became aware of the dispute over wallboard finish above ceilings and below floors (tr. 1/152). The wallboard finish in those areas had been inspected by the government and approved (tr. 1/153-54).

*Quality Assurance Deficiency Notice No. QA-00291*

34. Mr. Craig Schatz is a government inspector responsible for SCIF partition approval (tr. 1/70-71). He was the first one to raise the issue, in June 2016, of Level 4 wallboard finish above ceilings and below floors (id.). Mr. Douglass was not aware of any other inspectors raising the issue before Mr. Schatz raised it (tr. 1/78-79). Before Mr. Schatz raised the issue of extending Level 4 finish to concealed spaces, fire-taping had been applied for approximately a year and a half (tr. 1/74-75). CO Young understood that the drywall finishing issue was first raised by Mr. Schatz, USACE security inspector, in relation to SCIF areas (tr. 2/117-18).

14

35. In about June 2016 COR Flere's staff told him they believed there was a problem with finishes in the buildings. He read specification section 09 29 00, paragraph 3.11.7 Level 4 Finish, and without prompting from his staff he read 3.11.7 to require "Level 4 finish on all the walls in the building." (Tr. 3/6-7) COR Flere asked the project architects, HDR, if that was what they intended and HDR came back several days later and said "yes" (tr. 3/7). At that point COR Flere determined that a QA deficiency should be issued (tr. 3/8). Prior to June 2016 drywall finishes had not been an issue (tr. 3/12).

36. On June 15, 2016, USACE issued deficiency notice, QA Deficiency No. QA-00291, stating that the Level 4 finish required above ceilings and below floors was not being applied (R4, disc 1, tab 3h). It is roughly 20 feet floor to floor with 9 to 10 feet of architectural wall height and 10 feet of concealed wall below the floors and above the ceilings (tr. 1/73).

*Direction to Provide Level 4 Above Ceilings and Below Floors*

37. During a June 21, 2016, meeting between KP and the USACE, COR Flere agreed to reduce the finish level to "2.5 to 3 above ceilings and below floors" (app. supp. R4, tab 19 at 2). After the meeting COR Flere sent KP an email, notifying KP that the USACE area engineer and resident engineer would not allow the lesser finish. KP was required by the contract to provide Level 4 finish above the ceilings and below raised floors. (*Id.*)

38. LTC Sexton testified that he discussed the June 21, 2016 meeting and the email with Mr. Rasmussen, COR Flere and Mr. Morrissey and stated:

> It was a - - it was a litigation management decision, because in their experience and their opinion was that if we deviate from that sentence in the specifications that says 'all other areas shall be Level 4' and we accept something else, then that validates KP's position to come after - - to submit for an extra charge to go up from a Level 1 is what they believe they should do in those areas.

(Tr. 1/159-60) COR Flere also recalled that this decision was due to litigation strategy (tr. 3/49).

39. By email dated June 22, 2016, to CCI, KP passed on USACE's direction to provide a Level 4 finish above ceilings and below raised floors (app. supp. R4, tab 19 at 1).

40. By email dated June 23, 2016, to LTC Sexton, Mr. Douglass attached documents relevant to KP's interpretation of the Level 4 finish requirement (app. supp.

15

R4, tab 80 at 1-9). Mr. Douglass testified that he felt KP and CCI were interpreting the contract correctly and he wanted to give LTC Sexton supporting material (tr. 1/87-89). Referring to section 09 29 00, paragraph 3.11.7.4.c., "All remaining locations, unless noted otherwise" as a "catch all" statement, Mr. Douglass wrote, "I believe the 'catch all' in the specification was intended to ensure all areas exposed to public view would have a minimum of a L4 finish" (app. supp. R4, tab 80 at 1; tr. 1/87-89). Mr. Douglass repeated this interpretation during his testimony at the hearing (tr. 1/109-10). LTC Sexton responded on June 23, 2016, with "I believe this supports your argument completely" (app. supp. R4, tab 80 at 1). At the hearing, LTC Sexton testified that he believed KP's interpretation of the wallboard specifications was reasonable (tr. 1/155).

41. COR Flere testified about a picture showing the drywall in a room where mechanical/electrical equipment, sprinkler pipe and HVAC ducting had been installed above the ceiling but the drop ceiling had not been installed so the equipment was visible. The area above the ceiling was full of equipment. (Supp. R4, tab 1 supp. photos, 1a) Four more pictures showed drywall in rooms with very congested equipment above ceiling level. It was obvious that the drywall finishing below the ceiling was much different than that above. (*Id.* at 1b, c, d, e) COR Flere testified that they told KP that in areas where there was so much congestion, such as this area, that it did not need to bring it up to a higher Level 3 finish above the ceiling, what was there was okay for security accreditation (tr. 3/18). However, where the drywall above the ceiling level was accessible, they required KP to go back and meet a Level 3 or "three-plus" finish (tr. 3/22-24). COR Flere testified that he was attempting to mitigate the damage caused by requiring KP to go back and upgrade the finish above ceiling level where equipment had been installed (tr. 3/24).

42. Mr. Stayer testified that after USACE's direction to apply a Level 4 finish above ceilings and below floors CCI complied and "it was a tremendous cost to our bottom line" (tr. 1/260). The work was made much more difficult because by the time of the direction much of the mechanical/electrical equipment had been installed above the ceilings and below the floors (tr. 1/261-63).

*CCI Alleges Change*

43. By email dated June 27, 2016, to KP, CCI took the position that USACE's direction concerning Level 4 finish was a change to the contract:

> It is CCI's position that the level 4 finish that USACE is
> requesting is a change to the contract documents and
> therefore compensable. CCI never bid finishing to a
> level 4 below floors, and above ceilings. If KP/USACE is
> requesting CCI take immediate action to perform this
> change in scope, then everyone needs to understand that by

16

doing so there are cost associated with this direction. CCl will start rounding up labor all across the country and preparing EAL lists and housing accommodations per this request. At a later point USACE comes back and agrees this is a change and chooses not to move forward, there will still be cost associated with this direction. At this point and time with how the Omaha and surrounding labor markets are not able to provide resources to perform this work, CCI will have to bring in finishers at a significantly higher rate[] and to get manpower to come to Omaha. In projecting costs to achieve this added scope of work from USACE a R.O.M could reach as high as 5 million dollars to perform this work.

It is CCI's position that USACE knew and understand the standards of the finishing in the contract below floors and above ceilings when negotiating RFP's which set the standard of what was acceptable. During many negotiations USACE set the standard of finishing to be 6" above ceilings in writing and when ceiling heights changes RFP's 182, 225, 211 USACE requested credits for the reduced finishing above ceilings. Please see the attached document showing in writing the government's position on finishing above ceilings.

(App. supp. R4, tab 19 at 1) The referenced attachment includes a USACE comment to CR 182 including "Update 3/9/2015: It is understood that finishing of walls would extend maybe 6' above the ceiling height, so originally the wall finishes probably would have run up to about 10.5', now would go to about 9'-10"" (*id.* at 3).

*Tentative Agreement*

44. By email dated July 6, 2016, from LTC Sexton to KP, LTC Sexton agreed that what KP was providing was acceptable:

I'm sending a note to verify the conversation we had today regarding the level of drywall finish below the floor and above the ceiling for the STRATCOM project. We agree that what you've provided to date is adequate for our owner's security concerns. Having the drywall screws covered with drywall mud or spackle compound, and having the joints covered with tape is adequate above ceilings and below raised floors. We mutually agree

17

USACE will not request or pursue a credit from a level 4
finish. and Kiewitphelps will not request an additional
payment for this interpretation of the contract.

(R4, disc 1, tab 6) KP's Mr. Douglass, responded to LTC Sexton on the same day
stating:

I am in agreement with you on the requirements outlined
below for the level of finish required above ceilings and
below floors. Additionally, KP will not pursue additional
costs to perform this level of finish. We agree this is the
required level of finish at both rated partitions and SCIF
partitions (above ceilings and below floors) for the
project.[11]

Thank you for helping the team to solve this disagreement.

(R4, disc 1, tab 7)

45. Mr. Douglass testified that LTC Sexton later called him and told him that
their agreement had been overruled and would not be honored. KP was told to do
Level 4 everywhere and KP directed CCI to comply. (Tr. 1/129-30) LTC Sexton
similarly testified that the tentative agreement he entered into was not supported by
USACE ACO Rasmussen and USACE (tr. 1/168-69).

46. By letter to ACO Rasmussen, dated August 1, 2016, KP provided notice
that it considered USACE's direction to provide a Level 3 finish[12] at wallboard areas
not to be prepared for decoration, i.e., full wall height above ceilings and below raised
floors, as a change to the contract (R4, disc 1, tab 10 at 1). KP stated that it was
proceeding in accordance with the direction. KP offered a "rough order of magnitude"
for the cost of the change as $1.2M - $1.5M. (*Id.*) By email also dated August 1,
2016, KP directed CCI to proceed applying a Level 3 finish to wallboard above
ceilings and below raised floors (app. supp. R4, tab 20 at 1, 4).

---

[11] There appears to be a disconnect between LTC Sexton's letter that refers to finishing
"wallboard above ceilings and below raised floors" and KP's response that
refers to finishing "at both rated partitions and SCIF partitions (above ceilings
and below floors)."
[12] USACE reduced the finish requirement from Level 4 in Deficiency No. QA-00291 to
Level 3.

47. ACO Rasmussen responded to the notice of change on October 24, 2016, explaining why the USACE disagreed with the alleged change:

> Specification section 09 29 00 Gypsum Wallboard, paragraph "3.11.7 Level 4 Finish", Item 4 Location provides all locations that a level 4 finish is required in the facility with Item C. stating specifically "c. All remaining locations, unless noted otherwise." Specification section 09 29 00 Gypsum Wallboard, paragraph "3.11.7 Level 4 Finish", Item 1, [o]nly tells the contractor how the level of finish is to be achieved per industry standard. Finally, specification section 09 29 00 Gypsum Wallboard, paragraph "3.11.6 Apply Joint Compound and Tape in accordance with fire-rated design" directs the contractor on how much wall must be fire taped and mudded but the level of finish is still directed per specification paragraph 3.11.7 Level 4 Finish.

(R4, disc 1, tab 13) ACO Rasmussen noted that the USACE agreed to accept Level 3 finish in lieu of Level 4 (*id.*).

*Certified Claim*

48. On November 17, 2016, KP submitted a certified claim for an "estimated increase" of $5,469,225 as a result of the direction for it to apply "a high level of drywall finish above the ceilings and below the raised floors" (R4, disc 1, tab 14 at 1). KP requested a prompt CO's final decision (*id.*).

*Final Decision*

49. Ms. Young was assigned as a CO on the STRATCOM project in January 2016 (tr. 2/6). In November 2016, CO Young received KP's claim for the drywall work and assembled a team to review it (tr. 2/14, 16; R4, disc 1, tab 14). CO Young understood that it was security concerns that caused concerns over finish levels (tr. 2/26-27). CO Young agreed that to require a Level 4 finish above ceilings and below floors is "atypical" from what is specified in ASTM C 840 (tr. 2/55-56). CO Young agrees that USACE's interpretation that Level 4 finish is required above ceilings and below floors conflicts with ASTM C 840 and paragraphs 3.11.1 and 3.11.7.1 (tr. 2/57-58). Even so, on March 14, 2017, CO Young issued a final decision denying KP's claim (R4, disc 1, tab 1). CO Young affirmed her statement in her final decision that "Although inspections have been ongoing since April 2015 and the first deficiency was recorded on 15 June 2016, the fact that

neither party recognized deficiencies in the wallboard finishes for more than a year does not change the requirements of the contract" (tr. 2/73, 76; R4, disc 1 tab 1 at 12).

*Appeal*

50. On June 2, 2017, KP timely filed its notice of appeal and complaint with the Board. On June 6, 2017, the Board docketed the appeal as ASBCA No. 61197.

## DECISION

*Contentions of the Parties*

This case has a lot of moving parts as evidenced by the somewhat complicated findings of fact but it is essentially about the correct interpretation of one sentence – "All remaining locations, unless noted otherwise" at Division 09 – Finishes, section 09 29 00 Gypsum Board, paragraph 3.11 Wallboard Finishes, subparagraph 3.11.7, Level 4 Finish, subparagraph 4. Locations, subparagraph c. (finding 15).

KP contends that subparagraph 3.11.7.4.c. should be read to be consistent with subparagraphs 3.11.7.4.a. and b. that specify locations to be decorated which are exposed, not concealed, surfaces (app. br. at 71). According to KP, "All remaining locations" means locations to be decorated that are not identified in subparagraphs a. and b. KP argues this is the only interpretation that is consistent with all of the specifications, modifications, trade practice and course of dealing. One of KP's alternative theories,[13] is that its interpretation should prevail based on "risk allocation principles" or *contra proferentem.* (App. reply br. at 86-89)

USACE contends that the "plain and unambiguous meaning of a written agreement controls" (gov't br. at 9), that the contract only allows finish Levels 4 and 5 and paragraph 3.11.7.4.c. unambiguously requires finish Level 4 everywhere in the buildings, including above ceilings and below raised floors (gov't br. at 9-12). According to USACE, "All remaining locations" means just that, all locations whether exposed or concealed.

Contract interpretation begins with examination of the plain language of the written agreement. *LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009). The terms are given their plain and ordinary meaning; if the contract language is clear and unambiguous, the plain language controls and extrinsic evidence is not allowed to contradict the plain language. *Coast Federal Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003). The contract terms are interpreted and read as a whole, giving reasonable meaning to all of its parts, and without leaving a "portion of the

---

[13] We do not address all of KP's numerous alternative theories.

contract useless, inexplicable, void, or superfluous." *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). If the terms in question are determined to support more than one interpretation, the contract language may be deemed ambiguous. *Id.* at 1159. However, "[t]o show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" *Id.* (citing *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)).

*HDR Intended Level 4 Finish be Applied Above Ceilings and Below Floors*

Mr. Hailey was the architect at HDR who drafted 3.11.7.4.c. (findings 2, 15). He testified that the STRATCOM project was designed around DCID 6/9 security requirements (finding 7). DCID 6/9 requires wall construction that would allow for visual detection of wall penetrations but does not specify how to achieve that requirement[14] (*id.*). He testified that "All remaining locations, unless noted otherwise" was intended to make it clear that Level 4 finish was to be applied everywhere in the buildings including above ceilings and below floors (finding 15). We conclude that Mr. Hailey intended to impose a Level 4 finish everywhere, including concealed locations, to satisfy DCID 6/9. Mr. Hailey's testimony was both credible and unrebutted. USACE has proven that its architect drafted 3.11.7.4.c. intending that it communicate that a Level 4 finish be applied everywhere including above ceilings and below floors. That is not to say that said intent was clearly communicated. At the hearing, Mr. Hailey was asked why in 3.11.7.4.c. he did not specifically state Level 4 finish shall be applied above ceilings and below floors. He responded, "I didn't want to call it out." He was asked why but his explanation was confusing. (Finding 15)

There is no evidence in the record that Mr. Hailey, HDR or USACE communicated to KP or CCI, in any way, the intent behind the language of 3.11.7.4.c. before June 15, 2016, when USACE issued quality assurance deficiency notice, QA Deficiency No. QA-00291 (finding 36). Therefore, USACE cannot, and does not, argue that KP/CCI entered into the contract knowing that USACE's interpretation of the drywall specifications differed from KP's/CCI's. *C.S. McCrossan Construction, Inc.*, ASBCA No. 49647, 00-1 BCA ¶ 30,661 at 151,380 (If one party entered into a contract knowing that the other party's interpretation differed from its own, that party is bound by the contrary interpretation.).

---

[14] Mr. Hailey apparently was not aware that specification section 01 32 52 02 24 incorporated ICD 705 and ICS 705-1 into the contract. ICD 705 rescinds DCID 6/9 but ICS 705-1 includes the same requirement that wall construction provide for visual detection of wall penetrations. (Findings 9-10)

*Bidder Inquiry No. 4179969*

The government's response to bidder inquiries can be very important in interpreting a contract. Recently we held that the government's response to bidder inquiries can be used to evaluate the reasonableness of the parties' interpretation of the contract. *Parsons Evergreene, LLC*, ASBCA No. 58634, 18-1 BCA ¶ 37,137 at 180,793. However, in *Parsons* the questions and answers were clear and repeated multiple times. In this case Bidder Inquiry No. 4179969 was confusing. It read, "Spec section 09 29 00 identifies various drywall finish levels (Level 1-7). Please identify where each finish level is to be applied." (Finding 2) It mixed the seven levels of paint finish with the drywall specification section 09 29 00. Mr. Hailey answered the inquiry telling the bidder where to put paint in terms of drywall finish. (*Id.*) Neither party considered Bidder Inquiry No. 4179969 particularly important. In her final decision, CO Young stated there were no bidder inquiries involving drywall finish (finding 3). Under these circumstances we hold that Bidder Inquiry No. 4179969 plays no role in interpreting this contract.[15]

*Specification Paragraph 3.11.6 is a Wallboard Finish Requirement*

USACE contends that paragraph 3.11.6 is not a wallboard finish requirement (gov't br. at 13-14). USACE argues that since paragraph 3.11.6 and a Level 1 finish are different, paragraph 3.11.6 cannot be a finish requirement (*id.* at 14). This is important to USACE's argument because it contends that the only wallboard finishes allowed in the contract are Levels 4 and 5 (*id.* at 3).

Paragraph 3.11.6 requires that joint compound and tape be applied in accordance with fire-rated design and that "joints, screw heads, and internal corners" be filled with compound (finding 14). Level 1 finish requires that "joints and interior angles shall have tape embedded in joint compound" (finding 18). We do not see how the addition of filling screw heads disqualifies paragraph 3.11.6 from being a Level 1 finish. After all, wallboard finishing involves nothing more than the application of wallboard tape and compound[16] (findings 1, 13, 18). Paragraph 3.11.6 is part of section 3.11 Wallboard Finishing, which we interpret includes 3.11.6 as a finishing requirement (finding 14). Only one witness, Mr. Hailey, testified that paragraph 3.11.6 had nothing to do with drywall finish (*id.*). Numerous other witnesses, Mr. Douglass, Mr. Stayer, ACO Knight, Mr. Wright, and Mr. Fulks, testified that fire-taping was synonymous with a Level 1 finish (findings 1, 5, 14, 22, 26, 31). The evidence overwhelmingly supports our conclusion that fire-taping is a Level 1

---

[15] The inquiry presented a perfect opportunity for Mr. Hailey be more specific about where he intended Level 4 finish to be applied.

[16] We recognize that not all fire-taped joints will receive decoration.

finish and paragraph 3.11.6 is a finish requirement. The contract therefore provides for Levels 1, 4 and 5 wallboard finishes and fire-taping is a Level 1 finish.

*KP's Interpretation of 3.11.7.4.c. is Reasonable*

For an interpretation to be reasonable, it need not be the best interpretation; it need only be within the "zone of reasonableness." *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009). The record is replete with evidence that KP's interpretation is well within the zone of reasonableness, if not the best interpretation. We will briefly go through the support for our conclusion.

As we have determined that the fire-taping required by paragraph 3.11.6 is a Level 1 finish, USACE's argument that only Levels 4 and 5 finishes are allowed by the contract is incorrect. This supports KP's/CCI's interpretation.

There are the specifications that state a Level 4 finish is typically used for exposed walls that are to be decorated with paint, etc. (findings 18-21). The painting specification states that concealed surfaces will not be painted (finding 11).

Trade practice may be useful in interpreting a contract. *Teg-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). In this case trade practice is evidenced by the subcontract bids that priced fire-taping above walls and below floors (finding 4). Mr. Stayer's testimony that fire-taping above ceilings and below floors is consistent with trade practice is credible and unrebutted (finding 5).

There was the October 3, 2014 pre-construction meeting dealing with "Non-Structural Framing and Drywall" (finding 22). In the meeting it was agreed that fire-taping was all that was required above ceilings and below floors (*id.*).

There is the year and a half course of dealing with USACE. We have relied upon course of dealing to interpret contracts. *Lear Siegler Services, Inc.*, ASBCA No. 54449, 05-1 BCA ¶ 32,937 at 163,174 ("Consideration of a prior course of dealing between the parties can be appropriate to aid in the interpretation of contract language.") (citation omitted), *rev'd on other grounds, Lear Siegler Services, Inc. v. Rumsfeld*, 457 F.3d 1262 (Fed. Cir. 2006); *see C.R. Pittman Constr. Co.*, ASBCA No. 54901, 08-1 BCA ¶ 33,777 at 167,178. Both parties agree that for the first year and a half USACE and KP/CCI interpreted the wall finish requirements the same. USACE inspectors conducted detailed inspections and routinely accepted fire-taping of joints above ceilings and below floors (findings 34, 49).

There are the three modifications lowering ceiling heights where USACE requested and received cost reductions for the reduction in higher level finishing and

23

painting occasioned by the change (findings 25-26). Even CO Young agreed that if Level 4 finish was required above ceilings and below floors, the cost reductions would not have been appropriate (finding 27). These modifications evidence USACE's initial understanding that Level 4 finish was not required above ceilings and below floors.

There is the mock-up room where Level 4 finish was not shown above ceilings and below floors (finding 28). The purpose of the mock-up room was to establish the construction and quality standard that both USACE and KP agreed to (*id.*).

All of this evidence supports our conclusion that KP's/CCI's interpretation of "All remaining locations, unless noted otherwise" was within the zone of reasonableness.

*The Government's Interpretation of 3.11.7.4.c. is also Reasonable*

We found above that Mr. Hailey intended "All remaining locations" to require a Level 4 finish everywhere, including concealed locations. We are troubled by Mr. Hailey's testimony that he wasn't more specific because he "didn't want to call it out" (finding 15). We do not understand Mr. Hailey's reluctance to be more specific; his language could have easily been much clearer in expressing his intent. This entire situation could have been avoided if he had simply stated that a Level 4 finish must be applied from true floor to true ceiling including above architectural ceilings and below raised floors. Nevertheless, we conclude that "All remaining locations" can be interpreted as USACE argues. USACE's interpretation is within the zone of reasonableness.

*Subparagraph 3.11.7.4.c. is Ambiguous*

Because both KP's/CCI's and USACE's interpretations are reasonable, we conclude that subparagraph 3.11.7.4.c. is ambiguous. Language is legally ambiguous if there are two reasonable interpretations. *NVT Technologies,* 370 F.3d at 1159; *M.A. Mortenson Co.,* ASBCA No. 50383, 00-2 BCA ¶ 30,936 at 152,705. Having found the language ambiguous, parol evidence may be used to clear up the ambiguity. *Teg-Paradigm,* 465 F.3d at 1338-39 (Although the parol evidence rule bars the use of extrinsic evidence to supplement or modify a written agreement, the rule does not bar the use of extrinsic evidence to interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself.). The only extrinsic evidence of the intended interpretation of 3.11.7.4.c. is Mr. Hailey's testimony that he intended 3.11.7.4.c. to require Level 4 finish on all walls including above ceilings and below floors (finding 15). However, Mr. Hailey's interpretation was never communicated to KP/CCI and cannot now clear up the ambiguity. *Thefaf Al-Rafidain Contracting Co.,* ASBCA No. 59014, 14-1 BCA ¶ 35,573 at 174,333-34 (A party's uncommunicated interpretation of a contract provision does not bind the other contracting party.).

*The Ambiguity is Latent and Contra Proferentem Applies*

Without extrinsic evidence to help clear up the ambiguity, the Board must determine if the ambiguity is latent or patent – a question of law. *States Roofing*, 587 F.3d at 1368. If the ambiguity is patent, a duty to inquire arises on the part of the non-drafter:

> If the ambiguity is patent, it triggers a duty to inquire. A patent ambiguity is one that is "obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start." *H&M Moving, Inc. v. United States,* 204 Ct. Cl. 696, 499 F.2d 660, 671 (1974). If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail. *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed. Cir. 1997).

*NVT Technologies,* 370 F.3d at 1162.

It is difficult to prove patent ambiguity:

> As we have stated, "'[t]he doctrine of patent ambiguity is an exception to the general rule of *contra proferentem,* which courts use to construe ambiguities against the drafter.'" *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1313 (Fed. Cir. 2007) (quoting *E.L. Hamm & Assocs. Inc. v. England,* 379 F.3d 1334, 1342 (Fed. Cir. 2004)). For that reason, the bar to proving patent ambiguity is high, and the inconsistency must be so "obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start." *NVT Techs.,* 370 F.3d at 1162 (internal quotation marks omitted, alteration in original).

*LAI Services,* 573 F.3d at 1315-16; *see also Triax Pacific,* 130 F.3d at 1475.

In this case virtually no one raised any questions about the interpretation of "All remaining locations" for a year and a half during which time USACE accepted fire-taping above ceilings and below floors (findings 34, 49). This is proof that the ambiguity was not patent and KP/CCI had no duty to inquire. Accordingly, the ambiguity was latent:

> As precedent explains, there must be a glaring conflict or obvious error in order to impose the consequences of misunderstanding on the contractor. *See HPI/GSA 3C,*

25

*LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) ("Where an ambiguity is not sufficiently glaring to trigger the patent ambiguity exception, it is deemed latent and the general rule of *contra proferentem* applies."); *Blount Bros. Const. Co. v. United States*, 171 Ct. Cl. 478, 346 F.2d 962, 973 (1965) ("[Contractors] are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction, for...the basic precept is that ambiguities in contracts drawn by the Government are construed against the drafter.").

*States Roofing*, 587 F.3d at 1372. It is not enough to prove latent ambiguity, the contractor must also prove reliance on the latent defect to prevail:

> If the ambiguity is not patent, but latent, we construe it against the drafter under the rule of *contra proferentem*. *Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed. Cir. 1999). For the rule to apply, however, the nondrafting party must prove that it relied on its interpretation during bidding. *Fruin-Colnon Corp. v. United States,* 912 F.2d 1426, 1430 (Fed. Cir. 1990).

*Weis Builders, Inc.*, ASBCA No. 56306, 10-1 BCA ¶ 34,369 at 169,722. Again, a year and a half of performance and acceptance of fire-taping proves that KP/CCI relied on its interpretation of the ambiguous language. We therefore apply *contra proferentem* and construe the ambiguous language "All remaining locations" against the drafter USACE.

26

## CONCLUSION

For the reasons stated above we sustain the appeal and return the matter of quantum to the parties.

Dated: April 24, 2019

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61197, Appeal of KiewitPhelps, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

27